**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LEON DAVIS, JR.,

Petitioner,

v. Case No. 8:24-cv-860-WFJ-CPT

SECRETARY, DEPARTMENT OF CORRECTIONS, *et al.*,

Respondents.
____________________________________/

# ORDER

In 2012, Leon Davis, Jr., was sentenced to death for murdering two people during an attempted robbery of a BP gas station in Polk County, Florida. After unsuccessfully challenging his convictions and sentences in Florida state court, Davis filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Having carefully reviewed the petition, the response (Doc. 22), the reply (Doc. 28), and the voluminous state-court record (Doc. 23), the Court concludes that Davis is not entitled to relief on any of his claims. Therefore, the petition is **DENIED**.[1]

[1] In a separate state-court case, Davis was sentenced to death for two murders he committed during the robbery of the Headley Insurance Agency in Lake Wales, Florida. *Davis v. State*, 207 So. 3d 142, 146-47 (Fla. 2016). Davis filed a federal habeas petition challenging those convictions as well. *Davis v. Sec'y, Fla. Dep't of Corr.*, No. 8:24-cv-861-WFJ-CPT (M.D. Fla.). Today, the Court resolves both petitions. Because the petitions raise several of the same claims, the Court's analysis of those overlapping claims is substantially the same in this order and the order entered in No. 8:24-cv-861-WFJ-CPT.

## I. Background

On direct appeal, the Florida Supreme Court summarized the facts and procedural history of this case as follows:

> On the evening of December 7, 2007, Davis drove to the vicinity of a BP gas station and convenience store (BP) with the intent to commit robbery. The BP was located near the intersection of Highway 557 and Interstate 4 in Polk County. Around 8:51 p.m. that evening, BP employee Dashrath Patel (Dashrath) and his friend Pravinkumar Patel (Pravinkumar) walked out of the convenience store's front door and across the parking lot to change the gas price sign.
>
> The BP had closed for the evening, and the convenience store lights were turned off. While talking on the telephone, another BP employee, Prakashkumar Patel (Prakashkumar), remotely locked the store's front door and began to change the gas prices on the cash register. Seconds later, the surveillance camera captured a person who appeared to be a black man, about six feet tall, who approached the front door of the store and pulled on the door. The man, who had a large build, was dressed in dark clothing and wore a hood and a face mask.
>
> Prakashkumar indicated to the man that the store was closed. The man then raised a gun to the window and fired one shot into the store towards Prakashkumar. Suddenly, the shooter's attention was drawn to Dashrath and Pravinkumar, and he ran across the parking lot toward them. Surveillance footage showed both men with their hands in the air, and Prakashkumar reported hearing two gunshots that occurred about five to ten seconds apart. According to the surveillance footage, the gunshots were fired at approximately 8:53 p.m. After firing the gunshots, the shooter ran back to the store's locked front door and tried in vain to open it. He raised his gun again, but he then turned and ran away from the scene.
>
> In the meantime, Prakashkumar had activated the silent alarm, called 911, and sheltered in the storeroom. Upon arrival at the scene, the responding deputies learned that there were two missing people. Following a brief search, the bodies of Dashrath and Pravinkumar were located. Both victims were shot in the head execution-style with .38 caliber bullets.
>
> With the assistance of a trained K-9 search dog, law enforcement searched the immediate area for the scent of a person who may have recently left the scene. The K-9 detected a scent that tracked about one quarter of a mile to

the north of the gas station. Footprints led in the same direction that the K-9 tracked, up to the point where a set of tire tracks began. A crime scene technician photographed and made casts of the tire tracks.

In the days following the murders, law enforcement conducted traffic stops in the area of the BP to question drivers who may have seen something pertinent on the evening of the murders. During the course of these stops, four people provided information regarding a car that was parked that evening in an isolated area near the gas station. The witnesses described a dark-colored car, possibly a black Nissan, backed up against a gate. One of the witnesses described the car as having a distinctive grille on the front end.

Davis was not identified as a suspect in the December 7 BP murders until after the December 13 robbery, arson, and shootings at the Headley Insurance Agency in Lake Wales (Headley). Davis was positively identified as the perpetrator of those crimes. The lead detective in both the BP and the Headley investigations was Detective Ivan Navarro. Detective Navarro requested an analysis of the ballistics evidence obtained during the course of the BP and Headley investigations. The results of the analysis demonstrated that the same gun was used in the crimes at the BP and at Headley.

During the Headley investigation, a black Nissan Altima with a distinctive grille was seized from the parking lot of a local nightclub, and during a search of the car, Davis's driver license was found inside. Additionally, two dark-colored jackets were found in the car's trunk, and a pair of black gloves was found in the glove compartment. In light of the witness reports that a possibly black Nissan was parked near the BP on the evening of December 7, Detective Navarro requested an analysis of the BP tire casts and the tires from the Nissan Altima linked to Davis to look for similarities. The tires from Davis's Nissan Altima were consistent with the BP tire casts.

A grand jury later indicted Davis for multiple counts stemming from the BP events: two counts of first-degree murder, one count of attempted first-degree murder, one count of attempted armed robbery, and one count of possession of a firearm by a convicted felon.

### Guilt Phase

Davis waived a jury trial in favor of a bench trial. The State's theory was that Davis was a man burdened by significant financial distress and that he committed the murders of Dashrath and Pravinkumar during the course of an attempted armed robbery of the BP.

Evidence admitted at the trial revealed the following. At the time of the murders, Davis and his wife, Victoria, were in debt and unemployed. Victoria was pregnant at the time and was on a leave of absence from work due to pregnancy complications. The mortgage payment for the couple's home was delinquent, and the couple had given up driving one of their vehicles and cancelled their cell phone accounts because of their financial troubles. The couple shared Victoria's black Nissan Altima.

On the day of the BP murders, Davis purchased a Dan Wesson .357 magnum revolver from his cousin, Randy Black. Black also gave Davis .38 caliber bullets which were compatible with the .357 magnum. Davis returned home after purchasing the revolver, but he left home again that evening between 6 and 7 p.m. Davis was alone when he left, and he was driving the black Nissan Altima. Davis did not return home until between 9 and 9:30 p.m. Davis's home was a twenty-two to twenty-three minute drive from the BP.

Two days after the murders, Davis showed his mother the revolver that he purchased from Black. The known rifling characteristics of Davis's revolver, six lands and six grooves with right twists, were consistent with the characteristics of the projectiles obtained during the BP investigation, including the projectiles removed from the heads of the victims. The State's ballistics expert testified that .38 caliber projectiles could be fired from a .357 magnum firearm, and that the projectiles obtained during the BP investigation were consistent with having been fired from a Dan Wesson .357 magnum revolver.

The State introduced evidence from the Headley trial during the guilt phase of the BP trial. To prevent the introduction of improper evidence, the trial court entered a pretrial order that sharply limited the admissibility of Headley evidence. The limited Headley evidence revealed that on the morning of December 13, 2007, Davis went to the Lake Wales Walmart to make a purchase. Surveillance video footage obtained from the store depicted a tall black man entering the store around 7 a.m., and both a store manager and an employee positively identified the man in the video as Davis. While at Walmart, Davis purchased an orange lunch cooler.

That afternoon, Davis went to Headley, where he encountered Headley employee Yvonne Bustamante and shot her in her left hand. Shortly thereafter, Davis encountered Brandon Greisman near the Headley building. Greisman and his neighbors, who lived nearby, had walked towards the Headley building upon noticing the presence of smoke in the area. Greisman, who saw Davis and thought that he was there to offer help, saw Davis pull a gun out of an orange lunch bag and point it in his direction. Greisman tried

to get away but was unable to do so before Davis shot him in the nose. Greisman was transported to Lake Wales Hospital, where he underwent surgery and remained in the hospital overnight.

When Greisman was released, his mother drove him to the Lake Wales Police Department to speak to detectives. Greisman was shown a photographic lineup and asked if he recognized the man who shot him the day before. Greisman recognized Davis's photograph almost immediately and identified him as the shooter. At trial, Greisman also identified Davis from the witness stand.

Eyewitness Carlos Ortiz, who saw Davis place the gun into a lunch bag shortly after Greisman was shot, also identified Davis as the Headley shooter. At trial, Ortiz testified that in addition to getting an extended look at Davis at the scene, he recognized Davis because he previously saw Davis at Florida Natural Growers, where both men used to work. A few days after the Headley incident, Ortiz identified Davis's photograph from a photographic lineup. Ortiz also identified Davis from the witness stand.

Another Headley eyewitness, Fran Murray, testified that as she approached the Headley building, she saw a tall black man carrying an orange collapsible lunch pail, and she saw him place what appeared to be a gun inside of it.

Evelyn Anderson, a Headley customer, saw a tall black man exit the Headley building with a bag under his arm.

Ortiz and Murray also testified that they saw a black car in the area of the Headley building around the time of the shooting. The car was parked near a vacant house. Murray described the car as mid-sized, and Ortiz identified it as a Nissan.

Davis was also identified by the dying declaration of Yvonne Bustamante. Upon arriving at the Headley scene, Lt. Joe Elrod asked Bustamante if she knew the perpetrator's identity, and she responded, "Leon Davis." Bustamante told Lt. Elrod that Davis was a former Headley customer. In addition to Lt. Elrod, two emergency medical responders and eyewitness Anderson heard Bustamante identify Davis as the perpetrator.

The State's ballistics expert testified that the same gun was used in the BP murders and in the shootings at Headley.

## Davis's Defense

Davis's defense was misidentification. He offered an alibi for the time of the murders and attacked the eyewitness identifications made during the course of the Headley investigation.

Testifying in his own defense, Davis stated that on December 7, 2007, he brought his son to his home. Around 7:15 p.m., he left home alone to go Christmas shopping at the mall. Davis admitted that he was driving the black Nissan Altima at the time. While shopping, Davis did not see anyone that he recognized. Davis testified that although he spent around $150 in cash on clothing purchases, he did not have documentation for the purchases. He also testified that the money that he used to go shopping came from money that he had at home and a paycheck he had received the day before.

Davis testified that he left the mall around 8:30 p.m. and returned home around 9 p.m. He stated that he spent the rest of the evening at home with his family, leaving only briefly with his family between 9 and 10 p.m. to get dinner.

Davis also testified that less than one week later, he left the Nissan Altima parked at a nightclub, and that the gloves and jacket that the police later found in the car belonged to his wife, Victoria. Davis testified that he kept an unloaded gun in a toolbox in the garage that may have been unlocked, and that neither Victoria nor his son knew about the gun.

Davis was convicted as charged.

## Penalty Phase

Davis's bench trial proceeded to the penalty phase, where he waived his right to a penalty phase jury. The State sought to prove four aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation; (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in a commission of, or an attempt to commit, or flight after committing a robbery; and (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.[1]

[fn. 1] The trial court later rejected the avoid arrest aggravating circumstance as not proven.

The parties stipulated to Davis's July 2007 convictions for grand theft. Additionally, the State presented three witnesses who testified about the facts of the Headley murders, which were the basis for the prior capital/violent felony aggravating circumstance.[2] Lt. Elrod, who previously testified that Headley shooting victim Bustamante identified Davis as the perpetrator and explained that Davis tried to rob her, testified during the penalty phase that Bustamante explained how Davis threw gasoline on her and set her on fire when she told him that she did not have any money.

> [fn. 2] The trial court's order limited the scope of the Headley evidence that was admissible during the guilt phase. However, during the penalty phase, the trial court learned that prior to the shootings of Yvonne Bustamante and Brandon Greisman, Davis had robbed the insurance agency and set the building and two employees, Bustamante and Juanita Luciano, on fire. At the time, Luciano was twenty-four weeks pregnant. Davis shot Bustamante and Greisman during the course of his escape from the building.

The medical examiner in the Headley case, Dr. Stephen Nelson, testified regarding the injuries and causes of death of the three deceased victims, Bustamante, Juanita Luciano, and Luciano's newborn son, Michael. Bustamante and Luciano both died from thermal burns. Bustamante's burns covered eighty to ninety percent of her body, and Luciano's burns covered ninety percent of her body. Luciano's son, Michael, was delivered prematurely on the day of the events at Headley and died from extreme prematurity three days later. Additionally, crime scene technician Stacy Greatens testified regarding photographs of the Headley crime scene, including photographs of a cigarette lighter, duct tape, a burnt gas can, burnt shoes, and a burnt chair.

**Davis's Mitigation**

As mitigation, Davis presented evidence of a sexual assault when he was eight years old, severe physical abuse by a caretaker in the years following the sexual assault, ongoing depressive and mood episodes, and a suicide attempt while he was in the military. Davis submitted for the court's consideration the testimony of the three mitigation witnesses from the Headley trial: Dawn Henry, the mother of Davis's son; Linda Davis, Davis's mother; and India Owens, Davis's sister. Davis also introduced his medical records from his military service.

Davis's mother described her relationship with Davis as very close. Although Davis's father moved out of the family home when Davis was about one year old, his father maintained a relationship with Davis.

From elementary through high school, Davis suffered an ongoing pattern of bullying. When Davis was eight years old, another boy beat and sexually assaulted him. Although Davis's family members were aware of the assault, they did not talk about it.

Additionally, when Davis was around eight or nine years old, a woman named Ms. Clark came to live in the family home as a roommate. Eventually, Davis and his brother moved out of the family home and into another home with Clark. Clark was an alcoholic and was physically and verbally abusive. She taunted and verbally abused Davis because he was bullied, and she also beat him with extension cords and water hoses and punched him in the chest in order to try and make him "be a man." On one occasion, Clark severely beat Davis with an extension cord. Davis ran home to his mother, who observed severe injuries to his back. Family members observed physical injuries such as welts, bleeding, and scabs and sores on Davis's body.

In middle school, Davis contemplated suicide, and his mother encouraged him not to take his life. Davis received mental health counseling for two to three months. Davis later joined the military and while enlisted, he attempted suicide by hitting a concrete pole while driving at a high rate of speed. Thereafter, he was discharged from the military.

After Davis was discharged from the military, he met Dawn Henry. Henry and Davis eventually had a son who was born with Down Syndrome. Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted his son and was consistently and frequently present in his life. Around the time of the Headley robbery, Davis was depressed and upset that he could not afford to do anything for his son's approaching birthday. When Davis purchased the gun shortly before the robbery, his mother was concerned that he might use the gun to commit suicide.

## ***Spencer*** **Hearing and Sentencing**

Prior to sentencing Davis for the BP crimes, the trial court held a *Spencer*[3] hearing. Although no additional evidence was introduced, the defense made additional argument, and Davis made a statement to the Court that he was not near the BP gas station on December 7. The trial court ultimately sentenced Davis to death for the murders of Dashrath and Pravinkumar. Each

sentence of death was based on the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation (moderate weight); (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); and (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing a robbery (great weight). The trial court rejected as not proven that either capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

[fn. 3] *Spencer v. State*, 615 So.2d 688 (Fla. 1993).

The trial court also considered statutory and nonstatutory mitigating circumstances. The trial court found the existence of one statutory mitigating circumstance: the crime was committed while Davis was under the influence of extreme mental or emotional disturbance (little weight). Due to Davis's convictions for grand theft several months before the BP murders, the trial court rejected as statutory mitigation that Davis had no significant prior criminal history. The trial court also considered fifteen nonstatutory mitigating circumstances: (1) victim of bullying throughout childhood (moderate weight); (2) victim of sexual assault as a child (moderate weight); (3) victim of child abuse, both physical and emotional, by a caretaker (moderate weight); (4) overall family dynamics (little weight); (5) military service in the U.S. Marine Corps (little weight); (6) history of being suicidal both as a child and as an adult (slight weight); (7) diagnosed personality disorder (slight weight); (8) history of depression (slight weight); (9) stressors at the time of the incident (little weight); (10) good person in general (very slight weight); (11) good worker (little weight); (12) good son, good sibling, good husband (moderate weight); (13) good father to a child with Down Syndrome (moderate weight); (14) good behavior during trial as well as other court proceedings (slight weight); and (15) good behavior while in jail and in prison (little weight).

In addition to the sentences of death, the court also sentenced Davis to life imprisonment with a twenty-year minimum mandatory sentence for the attempted murder of Prakashkumar, twenty years' imprisonment with a twenty-year minimum mandatory sentence for attempted armed robbery, and fifteen years' imprisonment with a three-year minimum mandatory sentence for possession of a firearm by a convicted felon.

*Davis v. State*, 207 So. 3d 177, 183-88 (Fla. 2016).

The Florida Supreme Court affirmed Davis's convictions and sentences. *Id.* at 182. Davis then moved for postconviction relief in state court under Florida Rule of Criminal Procedure 3.851. *Davis v. State*, 383 So. 3d 743, 753 (Fla. 2024). He received an evidentiary hearing on several ineffective-assistance claims. *Id.* at 753-54. The postconviction court rejected all of Davis's claims in a written order, and the Florida Supreme Court affirmed the denial of relief in a lengthy opinion. *Id.* at 754. This federal habeas petition followed. (Doc. 1).

## II. Standards of Review

### A. AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

**B. Exhaustion of State Remedies; Procedural Default**

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

**C. Ineffective Assistance of Counsel**

Davis alleges ineffective assistance of counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Davis must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Davis must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion

### A. Constitutional Challenge to AEDPA

Before addressing Davis's claims, the Court pauses to consider a preliminary matter. As explained above, AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011). Davis argues that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), renders AEDPA deference unconstitutional. (Doc. 28 at 6-24). *Loper Bright* eliminated "*Chevron* deference," the doctrine that required federal courts to defer to a federal agency's reasonable interpretation of a statute that "is silent or ambiguous with respect to the specific issue at hand." 603 U.S. at 379-80, 412. Following *Loper Bright*, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," as required by the Administrative Procedure Act. *Id.* at 412. Davis contends that, in light of *Loper Bright*, a federal habeas court cannot defer to a state court's interpretation of the federal constitution because federal courts must maintain their independent judgment over federal cases. (Doc. 28 at 6-24).

"Every court to address this claim disagrees with this view and has concluded *Loper Bright* has limited applicability and does not implicate federal habeas practice." *Piper v. Att'y Gen. for S. Dakota*, 174 F.4th 1070, 1076 (8th Cir. 2026) (collecting cases). In an unpublished decision, the Eleventh Circuit joined this consensus, rejecting the argument that "*Loper Bright* . . . rendered AEDPA deference unconstitutional." *Bates v. Sec'y, Fla. Dep't of Corr.*, No. 25-12588, 2025 WL 2305211, at *1 (11th Cir. Aug. 1, 2025). The court

explained that "*Loper Bright* is an interpretation of the Administrative Procedure Act—not the Constitution." *Id.* Moreover, "[t]o the extent that the [Supreme] Court discussed the Constitution at all in *Loper Bright*, it did so only to provide historical background for the general principle that Article III courts must 'exercise [their] judgment independent of influence from the political branches.'" *Id.* (quoting *Loper Bright*, 603 U.S. at 385). According to the Eleventh Circuit, "*Loper Bright*'s observations about the relationship between the Article III judiciary and the 'political branches'" had "no bearing" on "the deference that AEDPA requires federal habeas courts to give state courts' decisions." *Id.*

For these reasons, the Court rejects Davis's argument that *Loper Bright* implicitly overturned AEDPA deference. *See, e.g.*, *Green v. Streeter*, No. 5:24-cv-1501-MHH-GMB, 2025 WL 3990174, at *10 (N.D. Ala. June 3, 2025) ("*Loper Bright*'s limited holding does not touch AEDPA deference."), *adopted by* 2025 WL 3721690 (N.D. Ala. Dec. 23, 2025). Unless otherwise noted, the Court evaluates Davis's claims under AEDPA's "highly deferential" standard of review.[2] *Felkner*, 562 U.S. at 598.

**B. Ground One—Admission of Headley Evidence During the BP Trial**

Davis argues that the trial court violated his rights to due process and a fair trial by allowing the prosecution to present evidence from the Headley case during the guilt phase of the BP bench trial. (Doc. 1 at 37-38). As the Florida Supreme Court explained, the trial

---

[2] Davis alternatively contends that the Court should adopt Justice Stevens's interpretation of AEDPA deference in *Williams v. Taylor*, 529 U.S. 362 (2000). (Doc. 28 at 24-25). "In *Williams*, Justice O'Connor delivered the section of the majority opinion interpreting § 2254(d)(1) [the provision establishing AEDPA deference], but Justice Stevens delivered the section applying the *Strickland* test to the facts at hand." *Phoenix v. Matesanz*, 233 F.3d 77, 80 n.1 (1st Cir. 2000) (citing *Williams*, 529 U.S. at 367). Because Justice Stevens's interpretation of AEDPA deference did not command a majority in *Williams*, the Court cannot follow it here.

court "entered a narrow [pretrial] ruling" that allowed the prosecution to present the following evidence from the Headley case: "eyewitness testimony identifying Davis as the Headley shooter, placing a black Nissan in the vicinity of the Headley building at the time of the shootings, and establishing that the same gun was used in both the BP and the Headley shootings." *Davis*, 207 So. 3d at 189. The trial court explained that "the identification of [Davis] at the 'Headley' crime scene as the person carrying and discharging a firearm [was] relevant to the State's attempt to demonstrate that [he] was the perpetrator of the crimes of the 'BP' crime scene." (Doc. 23-3 at 945).[3] Nevertheless, to prevent the Headley evidence from becoming a "feature of the case," the court excluded certain highly prejudicial details of the Headley incident, including the arson of the building, Davis's lighting the victims on fire, and the "condition of the victims." (*Id.* at 946-47). The evidence presented at the bench trial "was consistent with the terms of the trial court's order." *Davis*, 207 So. 3d at 190.

According to Davis, the pretrial ruling "resulted in the judge considering extensive evidence that was largely irrelevant to the question of identity of the perpetrator in this case." (Doc. 1 at 40). In Davis's view, the Headley evidence "was overly prejudicial . . . as [it] could not resolve the issue of whether [he] committed the crimes at BP." (*Id.* at 40-41). Instead, Davis maintains that the Headley evidence was admitted and considered "for the improper purpose of showing [his] bad character and propensity." (*Id.* at 41). Thus, Davis argues, "[t]he detailed and prejudicial Headley testimony so infected the BP guilt phase

---

[3] When citing the state-court record (Doc. 23), the Court uses the page numbers assigned by CM/ECF.

trial that [he] was denied due process under the Federal Constitution." (Doc. 28 at 38).

The Florida Supreme Court rejected Davis's argument, holding that the Headley evidence "was properly admitted to establish the nexus between Davis and the BP crimes." *Davis*, 207 So. 3d at 189. The court began by finding that the Headley evidence was relevant to "a material issue at trial"—Davis's identity as the perpetrator of the BP crimes. *Id.* at 191. The court explained that, although "the State lacked direct evidence that Davis fired the shots at the BP, ballistics evidence revealed that the same gun that fired the bullets that killed Dashrath and Pravinkumar at the BP also fired the bullets at Headley." *Id.* As a result, "Davis's possession of a gun at Headley, his firing of the gun, the retrieval of projectiles fired from the gun, and the comparison of those projectiles with those obtained during the BP investigation established the nexus between Davis and the BP crimes." *Id.* Moreover, Davis admitted to driving "his wife's black Nissan Altima on the night of the BP murders," and four people saw "a dark-colored vehicle, likely a black Nissan," in an "isolated location" near the BP crime scene. *Id.* Therefore, "testimony that a black Nissan was spotted near the Headley crime scene where Davis was positively identified as the Headley shooter was relevant to place Davis at the BP on the night of the attempted robbery and murders." *Id.*

The Florida Supreme Court emphasized that the trial court "closely guarded the admission of Headley evidence so as to allow only relevant evidence." *Id.* Likewise, the trial court was "extremely careful to guard against the admission of the highly prejudicial details of the events at Headley involving the arson and Bustamante's condition." *Id.* According to the Florida Supreme Court, the "carefully circumscribed" pretrial order

"prevented the details of the Headley crimes from becoming a feature of the BP trial." *Id.* Thus, the Florida Supreme Court found that "[t]he trial court's strict order and the subsequent admission of the evidence described therein carefully avoided the pitfalls of admitting irrelevant or unfairly prejudicial evidence." *Id.*

Even under *de novo* review, Davis cannot show that the admission of the Headley evidence violated his constitutional rights.[4] Federal courts "will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014). "Indeed, in a habeas corpus action brought by a state prisoner, [federal courts'] authority is severely restricted in the review of state evidentiary rulings." *Id.* (internal quotation marks omitted). Nevertheless, "when evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Andrew v. White*, 604 U.S. 86, 88 (2025) (internal quotation marks omitted). "[T]he category of infractions that violate 'fundamental fairness' [is] very narrow[]," *Dowling v. United States*, 493 U.S. 342, 352 (1990), which means that a habeas petitioner faces a "high bar" in making an admission-of-evidence due-process claim, *Taylor*, 760 F.3d at 1296; *see also Bryson v. Alabama*, 634 F.2d 862, 864-65 (5th Cir. Unit B Jan. 1981) ("A violation of state evidentiary rules will not in and of itself invoke [§] 2254 habeas corpus relief. The violation must be of such a magnitude as to constitute a denial of 'fundamental fairness.'").

---

[4] Respondents contend that Ground One is unexhausted and procedurally defaulted. (Doc. 22 at 35-36). The Court need not reach that issue because, even under *de novo* review, the claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event." (collecting cases)).

The admission of the Headley evidence did not render the BP bench trial fundamentally unfair. First, the Headley evidence was highly probative of Davis's guilt in the BP case. *See Andrew*, 604 U.S. at 96 (instructing courts to consider "the relevance of the disputed evidence to the charges" when evaluating an admission-of-evidence due-process claim). As the Florida Supreme Court explained, "Davis was positively identified as the gun-wielding perpetrator of the shootings at Headley," and "ballistics evidence revealed that the same gun that fired the bullets that killed Dashrath and Pravinkumar at the BP also fired the bullets at Headley." *Davis*, 207 So. 3d at 190-91. Therefore, "Davis's possession of a gun at Headley, his firing of the gun, the retrieval of projectiles fired from the gun, and the comparison of those projectiles with those obtained during the BP investigation established the nexus between Davis and the BP crimes." *Id.* at 191. Additionally, four people saw "a dark-colored vehicle, likely a black Nissan," near the BP crime scene. *Id.* Thus, "testimony that a black Nissan was spotted near the Headley crime scene where Davis was positively identified as the Headley shooter was relevant to place Davis at the BP on the night of the attempted robbery and murders." *Id.* The highly probative nature of the Headley evidence weighs against finding that its admission violated fundamental fairness. *See Richardson v. Lemke*, 745 F.3d 258, 276 (7th Cir. 2014) (admission of other-crime evidence did not violate due process because it "was extremely probative of [petitioner's] guilt" and "gave the prosecution the ability to use ballistics evidence to [identify petitioner] as the perpetrator of both offenses"); *Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir. 2006) ("Evidence of the [uncharged] burglary bears on the identity of [the] killer [in the charged homicide]. That the same gun belonging to

[petitioner] was used to shoot at [the burglary victim] and to kill [the homicide victim] is a signature element that links [petitioner] to both [crimes].”).

Second, the trial court was “extremely careful to guard against the admission of the highly prejudicial details of the events at Headley involving the arson and Bustamante’s condition.” *Davis*, 207 So. 3d at 191. These restrictions were observed at the bench trial. *Id.* at 190. Because the court “carefully avoided the pitfalls of admitting irrelevant or unfairly prejudicial evidence,” Davis cannot show that the admission of limited, highly probative evidence from the Headley case rendered his trial fundamentally unfair. *Id.* at 192; *see also Dowling*, 493 U.S. at 353 (noting that “the trial court’s authority to exclude potentially prejudicial evidence adequately addresses th[e] possibility” that the factfinder “will convict the defendant on the basis of [impermissible] inferences”); *United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir. 2001) (holding that the “right to a fair trial remains adequately safeguarded” so long as the trial court excludes “potentially devastating evidence of little probative value”).

Third, the Headley evidence was admitted during a bench trial, not a jury trial. *Davis*, 207 So. 3d at 184. “In bench trials,” judges are “presumed to ignore” “inadmissible evidence.” *Harris v. Rivera*, 454 U.S. 339, 346 (1981); *see also United States v. Foley*, 871 F.2d 235, 240 (1st Cir. 1989) (“[I]t must be assumed that in a bench trial the judge will not be influenced by irrelevant or prejudicial evidence.”); *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (“[I]n a bench trial, the . . . judge can also exclude . . . improper inferences from his mind in reaching a decision.”). The Headley evidence was carefully circumscribed to avoid the admission of irrelevant or inflammatory details.

Thus, Davis fails to "overcome th[e] presumption of conscientiousness" on the part of the trial court.[5] *United States v. Reed*, 744 F.3d 519, 525 (7th Cir. 2014) (internal quotation marks omitted).

### C. Ground Two—Failure to Adequately Cross-Examine State Firearms Expert and Retain Defense Expert

Davis contends that trial counsel provided ineffective assistance by (1) failing to adequately cross-examine James Kwong, the State's firearms expert, and (2) failing to retain an independent firearms expert to "challenge Kwong's testimony," primarily by explaining the alleged "shortcomings of firearms identification evidence." (Doc. 1 at 41-42, 53).

On the day of the BP murders, Davis "purchased a Dan Wesson .357 magnum revolver from his cousin," who also provided .38 caliber bullets that were "compatible with the .357 magnum." *Davis*, 207 So. 3d at 184. The "known rifling characteristics of Davis's revolver . . . were consistent with the characteristics of the projectiles obtained during the BP investigation, including the projectiles removed from the heads of the victims." *Id.* Thus, Kwong testified at the bench trial that "the projectiles obtained during the BP investigation were consistent with having been fired from a Dan Wesson .357 magnum revolver." *Id.* Kwong also testified that, after reviewing the ballistics evidence recovered from the BP and Headley crime scenes, he concluded that the "same gun fired all these bullets and bullet jacket fragments." (Doc. 23-6 at 979). In short, according to Kwong, "the

---

[5] In Ground Nine, Davis contends that the trial court improperly relied on "facts not in evidence to find [him] guilty of the BP crimes." (Doc. 1 at 89). Below, the Court explains why this claim lacks merit.

same gun was used in the BP murders and in the shootings at Headley." *Davis*, 207 So. 3d at 185.

On cross-examination, Kwong conceded that the bullets from the BP and Headley crime scenes could have been fired from either a .357 magnum or a .38 caliber firearm. (Doc. 23-6 at 985). Kwong also conceded that the murder weapon could have been manufactured by one of "at least" twenty-one different firearms manufacturers. (*Id.*)

Davis contends that counsel was ineffective for failing to go further in his cross-examination of Kwong. (Doc. 28 at 50-51). According to Davis, counsel should have highlighted "the scientific limitations" of the Association of Firearm and Tool Mark Examiners ("AFTE") theory of identification, the methodology employed by Kwong and most firearms analysts. (*Id.*; *see also Davis*, 383 So. 3d at 756). The Florida Supreme Court rejected this claim, finding that counsel's cross-examination was not "deficient." *Davis*, 383 So. 3d at 757. The court noted that, according to counsel's testimony at the postconviction evidentiary hearing, his "strategy was to undermine Kwong's testimony linking Davis to the firearm used in the BP and Headley shootings." *Id.* In pursuit of this strategy, counsel "gain[ed] concessions from [Kwong] that the murder weapon could have been a different caliber of firearm than the .357 magnum that Davis bought on the day of the BP murders, and that twenty-one different firearms could have produced the same firing characteristics." *Id.* Thus, according to the court, counsel's "cross-examination of Kwong did not constitute deficient performance." *Id.*

This ruling was reasonable. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which is "different from asking

whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 562 U.S. at 101. A strategic decision by counsel "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Thus, to prevail on his ineffective-assistance claim, Davis must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020).

Davis cannot make the required showing. He challenges the adequacy of counsel's cross-examination of Kwong, the State's firearms examiner. (Doc. 28 at 50-51). But "[d]ecisions about whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (internal quotation marks omitted). Here, counsel made a strategic decision "to undermine Kwong's testimony linking Davis to the firearm used in the BP and Headley shootings." *Davis*, 383 So. 3d at 757. Counsel followed through on this strategy, getting Kwong to concede on cross-examination that "the murder weapon could have been a different caliber of firearm than the .357 magnum that Davis bought on the day of the BP murders, and that twenty-one different firearms could have produced the same firing characteristics." *Id.* In light of the significant concessions counsel obtained during his questioning of Kwong, a reasonable

jurist could conclude that the "cross-examination at trial was sufficient to show the weaknesses in the witness's testimony." *Card v. Dugger*, 911 F.2d 1494, 1507 (11th Cir. 1990).

Moreover, Davis cannot prove ineffective assistance "by showing that additional attacks were possible and that counsel could have done more." *Fennie v. Crosby*, No. 8:03-cv-2068-SDM-TGW, 2011 WL 17630, at *13 (M.D. Fla. Jan. 4, 2011). "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (internal quotation marks omitted). A reasonable jurist could agree that counsel was not "constitutionally compelled" to use his cross-examination of Kwong to launch a general attack on the scientific validity of the AFTE theory of identification. *See LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014) ("[A]ttorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another, or for selecting a reasonable course without considering some other, equally reasonable course.").

Relatedly, Davis contends that counsel should have hired an expert to "explain[] to the factfinder why firearms examination was not a generally accepted science; why the validity of the fundamental assumption of uniqueness and reproducibility of firearms-related toolmarks had not yet been demonstrated; why firearms identification evidence was not reliable; and how this was relevant to the testimony offered by Kwong." (Doc. 1 at 53-54).

At the postconviction evidentiary hearing, Davis supported this claim by presenting testimony from Dr. Jeff Salyards. *Davis*, 383 So. 3d at 757. Dr. Salyards, "who is not trained in firearm and tool mark examination, criticized the AFTE theory of identification as lacking in scientific reliability." *Id.* Trial counsel testified about this issue as well. He explained that, before trial, he "reviewed numerous articles on the topic [and] tried to familiarize [himself] with what was being done in courts throughout the country in terms of attacking firearm analysis." (Doc. 23-12 at 679). Counsel also hired Terry LaVoy, a "very experienced and able firearm examiner," to review Kwong's work. (*Id.* at 679-82). After evaluating the evidence, LaVoy "agreed with [Kwong's] findings." (*Id.* at 689). Thus, counsel "did not see any viable expert [he] could call [who would] come in and actually discredit the firearm evidence." (*Id.* at 679). Counsel separately "made searches to find an expert who [he] felt was credible that could come in and say this science is junk." (*Id.* at 683). But counsel could not locate such an expert. (*Id.* at 684). Regardless, counsel believed that if he could not "show error in" Kwong's conclusions about the ballistics evidence in this case, it would not be an effective strategy to offer general criticisms of the reliability of firearms identification. (*Id.* at 697-700).

The Florida Supreme Court concluded that "[t]he failure to offer testimony such as that of Dr. Salyards [did] not render counsel's strategy objectively unreasonable." *Davis*, 383 So. 3d at 757. The court noted that counsel had "consulted with an experienced ballistics expert," Terry LaVoy, who "concluded that the bullets and bullet fragments in the BP case and the Headley case were fired from the same firearm." *Id.* at 758. As the court noted, counsel "explained that if he could not disprove the conclusion reached by the

State's expert, he did not believe that arguing general criticisms about firearms examination was an effective strategy." *Id.* Instead, the court explained, counsel "decided that he would focus on the fact that multiple types of firearms other than the .357 magnum that Davis purchased could have been used in the shootings." *Id.* The court concluded that counsel's "use of experts was based on his strategic decision-making and was not deficient." *Id.* Finally, the court noted that even if Dr. Salyards had testified at the bench trial, his testimony would have supported Kwong's conclusions in three respects: "(1) the crime lab that Dr. Salyards previously supervised used training, equipment, and quality control standards fairly similar to the AFTE method; (2) despite his criticism of the AFTE method, Dr. Salyards was unaware of an international organization that utilized a different theory of identification for training firearms examiners; and (3) Dr. Salyards conceded that the comparative microscope method utilized by Kwong to evaluate the BP and Headley bullets and bullet fragments is the most widely used method to determine whether two bullets were fired from the same gun." *Id.*

Once again, Davis fails to "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks*, 975 F.3d at 1176. Strategic choices, "including about whether to hire an expert, are entitled to a strong presumption of reasonableness." *Mackendrick v. Sec'y, Fla. Dep't of Corr.*, No. 23-13862, 2025 WL 3141739, at *1 (11th Cir. Nov. 10, 2025). Here, counsel retained an experienced ballistics expert who reviewed Kwong's work and "concluded that the bullets and bullet fragments in the BP case and the Headley case were fired from the same firearm." *Davis*, 383 So. 3d at 758. Based on these findings, counsel reasonably chose

to "focus on the fact that multiple types of firearms other than the .357 magnum that Davis purchased could have been used in the shootings." *Id.* Moreover, counsel tried, albeit without success, to "find an expert who [he] felt was credible that could come in and say [firearm-identification] science is junk." (Doc. 23-12 at 683). Thus, "[f]ar from being ineffective, [counsel] diligently investigated possible defenses and searched for favorable experts." *Duyst v. Rapelje*, 483 F. App'x 36, 49 (6th Cir. 2012). He was "ultimately unsuccessful in his efforts," but that "does not accrue to a finding of ineffectiveness." *Id.*; *see also McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008) ("That [petitioner] later secured a more favorable opinion of an expert than the opinion of [his trial expert] does not mean that trial counsel's failure to obtain that expert testimony constituted deficient performance."); *Flick v. Warren*, 465 F. App'x 461, 465 (6th Cir. 2012) ("Effective assistance does not require counsel to continue contacting experts until he found one . . . willing to testify against the prosecution's theory of the case.").

In short, Davis cannot show that the Florida Supreme Court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

### D. Ground Three—Bustamante's Dying Declaration

Davis argues that the trial court violated the Confrontation Clause when it admitted Bustamante's dying declaration. (Doc. 1 at 54-58). Lt. Elrod encountered a severely burned Bustamante in the Headley parking lot. *Davis*, 207 So. 3d at 199. He "quickly surmised that Bustamante would not survive her injuries," so he "began to ask [her] pointed

questions for the purpose of obtaining her statement." *Id.* Bustamante "explained that she and Luciano were working when Davis entered their office, demanded money from them, and tried to rob them." *Id.* She said that "when they did not give Davis the money that he wanted, he threw gasoline on them and set them on fire." *Id.* Lt. Elrod asked Bustamante if she "knew the perpetrator's identity." *Id.* She said, "[Y]es, it was Leon Davis," and explained that "he was a client of their insurance business." *Id.* Three other witnesses overheard this exchange. *Id.* at 185. Bustamante was also heard to say, "[P]lease keep me in your prayers. I'm not going to make it." *Id.* at 206. She passed away five days after the robbery. *Davis*, 207 So. 3d at 151.

Because the same gun that was used during the BP incident was used to shoot Bustamante during the Headley incident, "the State sought to introduce—during the BP trial—Bustamante's statements identifying Davis" as the perpetrator. *Davis*, 207 So. 3d at 198. "Before the BP trial, the court conducted an independent review of the evidentiary hearing testimony and concluded that Bustamante's statements would be admissible in that trial as a dying declaration." *Id.* As explained above, however, the court "sharply limited the extent to which [Bustamante's] statements would be admissible," restricting the testimony to her "identification of Davis as the person who shot her, and [her] identification of Davis based on her personal knowledge of him." *Id.*

According to Davis, the admission of Bustamante's dying declaration violated *Crawford v. Washington*, 541 U.S. 36 (2004). (Doc. 28 at 69). *Crawford* held that the Confrontation Clause generally bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had

a prior opportunity for cross-examination." 541 U.S. at 53-54. Here, as the Florida Supreme Court explained, "the State introduced, as a dying declaration, out-of-court testimonial statements of the declarant, Bustamante. Bustamante was unavailable to testify at trial, and Davis lacked a prior opportunity to cross-examine her." *Davis*, 207 So. 3d at 201. Thus, Davis argues that Bustamante's dying declaration was inadmissible under *Crawford*. (Doc. 28 at 69).

The Florida Supreme Court disagreed. It "join[ed] the overwhelming majority view that the dying declaration exception remains viable post-*Crawford*." *Davis*, 207 So. 3d at 202. Under *Crawford*, the government may introduce an unconfronted out-of-court statement if it fits a historically recognized common law exception. *See Crawford*, 541 U.S. at 54 (holding that the Sixth Amendment incorporates "exceptions" to the confrontation requirement "established at the time of the founding"). *Crawford* itself did "not decide . . . whether the Sixth Amendment incorporates an exception for testimonial dying declarations." *Id.* at 56 n.6. The Court recognized, however, that "[t]he existence of that exception as a general rule of criminal hearsay law cannot be disputed." *Id.* Later, in *Giles v. California*, the Court noted that dying declarations—statements "made by a speaker who was both on the brink of death and aware that he was dying"—were "admitted at common law even though they were unconfronted." 554 U.S. 353, 358 (2008). But *Giles* did not address whether dying declarations survived *Crawford*. *Id.* at 358-59. Thus, at the time of Davis's direct appeal (and to this day), the dying declaration exception "remains in High Court limbo." *Woods v. Cook*, 960 F.3d 295, 300 (6th Cir. 2020).

After surveying the relevant caselaw, the Florida Supreme Court "reject[ed] [Davis's] invitation to abrogate Florida's dying declaration exception." *Davis*, 207 So. 3d at 204. It held that the "unique nature and purpose of the dying declaration exception . . . justifies its continuing utility and validity as an exception to the rule against hearsay." *Id.* at 202. The court cited "the extraordinary nature of the dying person's ability to speak to the circumstances that placed her in that grave position, and quite possibly to identify the perpetrator and ensure that the one who commits murder is held accountable." *Id.* at 203. It also rejected Davis's "challenge to the reliability" of dying declarations, reasoning that "the certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose." *Id.* at 204 (quoting *Mattox v. United States*, 146 U.S. 140, 152 (1892)).

Having found that "*Crawford* did not abrogate the dying declaration exception in Florida," the Florida Supreme Court addressed "whether Bustamante's statements constituted a dying declaration." *Id.* at 205. The court found that they did. *Id.* at 206. A deceased's statement qualifies as a dying declaration if he "appreciated his condition as being that of an approach to certain and immediate death." *Id.* at 205 (internal quotation marks omitted). Here, "Bustamante, who was oriented and alert at the scene, was aware of her extensively burned body." *Id.* at 206. Indeed, Bustamante told Fran Murray that "her body hurt so bad, and that she knew that she wasn't going to make it." *Id.* Because "Bustamante clearly expressed her belief that she was not going to survive," the court held that her statements were "properly admitted . . . under the dying declaration exception." *Id.*

The Florida Supreme Court did not unreasonably apply clearly established federal law when it rejected Davis's Confrontation Clause claim. "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). Thus, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122. "The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law." *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012).

As explained above, the "Supreme Court has not clearly established that admission of a testimonial dying declaration violates the Confrontation Clause." *Brown v. Att'y Gen. of California*, 650 F. App'x 434, 436 (9th Cir. 2016); *see also, e.g.*, *Woods*, 960 F.3d at 300 ("Since *Crawford*, the U.S. Supreme Court has acknowledged the potential permissibility of [the dying declaration] exception to the Confrontation Clause. Under these circumstances, we cannot fault state courts for continuing to do what the U.S. Supreme Court has acknowledged they may be able to do after *Crawford* and what the Court itself did before *Crawford*."); *Martin v. Fanies*, 365 F. App'x 736, 738-39 (8th Cir. 2010) (ruling that the Minnesota Supreme Court did not violate clearly established federal law when it held that dying declarations were permissible under *Crawford*). To the contrary, "in *Crawford* and again in *Giles* . . . , the Supreme Court hinted that dying

declarations may fall within an exception to the constitutional bar against testimonial hearsay." *Walker v. Harry*, 462 F. App'x 543, 545 (6th Cir. 2012). Moreover, "a majority of states" have "interpret[ed] . . . *Crawford* as allowing dying declarations to be an exception to the Confrontation Clause." *State v. Williamson*, 249 A.3d 478, 492 (N.J. 2021) (collecting cases). Given the state of the law, it was not objectively unreasonable for the Florida Supreme Court to hold that dying declarations are permissible under *Crawford*.

Likewise, the Florida Supreme Court reasonably applied federal law when it found that Bustamante's statements qualified as a dying declaration. For a testimonial statement to be admissible at common law as a dying declaration, the declarant had to be "on the brink of death and aware that [s]he was dying." *Giles*, 554 U.S. at 358. Here, the evidence showed that "Bustamante received extensive burns of the second, third, and fourth degree, she was burned over at least eighty percent of her body, her flesh was falling off of her body, she was in severe pain, and the severity of her burns was indicative of a high probability of death." *Davis*, 207 So. 3d at 206. Moreover, Bustamante "was aware of her extensively burned body," telling a witness that "she knew that she wasn't going to make it." *Id.* As noted above, Bustamante succumbed to her injuries five days later. *Davis*, 207 So. 3d at 151. Under these circumstances, a fairminded jurist could conclude that Bustamante was "on the brink of death and aware that [s]he was dying" when she identified Davis as the perpetrator. *Giles*, 554 U.S. at 358; *see also Woods*, 960 F.3d at 301 (state court reasonably applied federal law by admitting dying declaration made ten days before declarant passed away); *Labon v. State*, 868 So. 2d 1222, 1223 (Fla. 3d DCA 2004) (dying

declaration properly admitted where declarant "knew of his grave condition and imminent death" and ultimately passed away eleven days after statement).

### E. Ground Four—Photopack Identifications

Within days of the Headley incident, eyewitnesses "Greisman (shooting victim) and Ortiz offered out-of-court identifications of Davis after viewing his photograph in a photopack (also known as a photographic lineup)." *Davis*, 207 So. 3d at 206. Both witnesses "also identified Davis in court during their trial testimony" in the BP case. *Id.* Davis argues that the photopacks shown to Greisman and Ortiz were "impermissibly suggestive," rendering their out-of-court and in-court identifications "inherently unreliable." (Doc. 28 at 75). Thus, according to Davis, the admission of the identifications violated his rights to due process and a fair trial. (*Id.*)

Greisman and Ortiz "were each shown a photopack that was printed on a piece of letter-sized paper and contained six photographs." *Davis*, 207 So. 3d at 207. The two photopacks were identical except for Davis's placement. *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 425, 436. "The photographs were divided into two rows, with three photographs on each row." *Davis*, 207 So. 3d at 207. After viewing the photopacks, the trial court in the Headley case explained: "It's . . . six black males, all of them have short hair, all of them have skin tones that are fairly similar. To me, they all look about the same age group, and I would have guessed mid 20s."[6] *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc.

[6] The court in the BP case adopted all relevant pretrial rulings in the Headley case—including the denial of the motions to suppress Greisman and Ortiz's identifications—and took judicial notice of pertinent portions of the Headley record. (Doc. 23-3 at 722-30, 770-71).

23-4 at 899. "The lower left corner of each photograph contained an identifying number ranging from one through six." *Davis*, 207 So. 3d at 207. In addition, "[b]elow the bottom row of photographs were six sets of book-in numbers, each of which corresponded to one of the photographs." *Id.* "Each of the numbers contained between seven and eleven digits and was printed in small font." *Id.* "Davis's book-in number contained the number 2007, and the other photographs each contained the number 93 or 94, representing the year that the photograph was taken." *Id.*

On direct appeal, Davis argued that the photopacks were unduly suggestive because his photograph alone contained a book-in number of 2007, the year the crimes took place. (Doc. 23-56 at 2011). The Florida Supreme Court disagreed, concluding that "the procedures used to obtain the out-of-court identifications made by Greisman and Ortiz were not unnecessarily suggestive." *Davis*, 207 So. 3d at 207. The court began by noting that the "photopack in this case [was] distinguishable from cases cited by Davis where a date was actually placed on the suspect's photograph." *Id.* at 207-08. To illustrate the point, the court considered *Brown v. Commonwealth*, 564 S.W.2d 24 (Ky. Ct. App. 1978), a "case involving the appeal of two defendants' robbery convictions." *Id.* at 208. The identification procedure in *Brown* was described as follows:

> The seven photographs shown [to the eyewitnesses] were mug shots from the files of the Jefferson County Police Department. In each photograph a board was suspended from around the neck of the individual. Each board contained information for identification purposes. In the case of Brown and Hill [the defendants], each board contained the abbreviation "ROB" and the date "November 17, 1975." In the other five photographs, the boards did not contain the robbery date of November 17, 1975, nor were any two dates the same. Only one of the other five photographs contained the abbreviation "ROB."

*Brown*, 564 S.W.2d at 26.

According to the Florida Supreme Court, "[t]hese facts, which include[d] the unequivocal use of the date of the crime and the abbreviation 'ROB' within the suspects' photographs, demonstrate[d] an unnecessarily suggestive photographic lineup." *Davis*, 207 So. 3d at 208. By contrast, "the photopacks shown to Greisman and Ortiz contained, beneath the entire set of photographs, six sets of book-in numbers that corresponded to the photographs above." *Id.* Moreover, "[t]he numbers were printed in small font and were innocuous," and both "Greisman and Ortiz quickly identified Davis's photograph." *Id.* Thus, the court concluded that the book-in numbers did not "render[] the photopacks unnecessarily suggestive." *Id.* Therefore, the trial court did not err in admitting Greisman and Ortiz's out-of-court and in-court identifications. *Id.*

This ruling was reasonable. The constitution imposes "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006). "When determining whether a photo array is unduly suggestive, [courts]

consider the size of the array, the manner of its presentation, and the details of the photographs in the array." *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015).

Davis cannot show that the Florida Supreme Court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. 86, 103. To the contrary, a reasonable jurist could find that the photopacks shown to Greisman and Ortiz were not unduly suggestive. As the Florida Supreme Court noted, the book-in numbers were "printed in small font" and placed "beneath the entire set of [six] photographs." *Davis*, 207 So. 3d at 208. Moreover, the officer who conducted the photographic lineup testified that (1) Greisman did not "say anything at all about" the book-in numbers, and (2) Ortiz did not "appear" to "look[]" at the numbers and did not "say anything" about them. *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 577, 877. Similarly, the trial judge in the Headley case stated that although he had "been a judge for 15 and a half years," he "didn't pick up on" the fact that the numbers "signifie[d] year[s]" until "it was pointed out to [him]." *Id.* at 900. "Absent any evidence that the witness[es] [were] influenced by the arrest dates," a reasonable jurist could conclude that the mere inclusion of the dates did not render the photopacks "unduly suggestive." *Kubat v. Thieret*, 867 F.2d 351, 358 (7th Cir. 1989); *see also United States v. Love*, 692 F.2d 1147, 1150 (8th Cir. 1980) (holding that "dates on the photographs did not increase the chances of misidentification" because the witness "testified that she hadn't noticed them"); *Steese v. State*, 960 P.2d 321, 333 (Nev. 1998) ("[Defendant] argues that the photographic line-up shown to [the witness] was impermissibly suggestive because his photograph was the only

one which was labeled with a 1992 booking date. However, this court has held that mere disparity in the dates on photographs is not sufficient to invalidate a photographic line-up." (internal quotation marks omitted)).

Davis points to several other alleged "indicia of suggestibility," but none rendered the photopacks unduly suggestive. (Doc. 28 at 88). For example, Davis points out that the photographs were all "black-and-white." (*Id.* at 89). But there is no reason to believe that this feature of the photographs increased the likelihood that the witnesses would identify Davis. *See United States v. Smith*, 967 F.3d 1196, 1204 (11th Cir. 2020) (photopack not unduly suggestive where "photographs all had similar backgrounds and were in black and white"); *United States v. Haile*, No. 2:22-cr-20629, 2023 WL 4118568, at *3 (E.D. Mich. June 22, 2023) (fact that "photo lineup was in black-and-white" did not make lineup "unduly suggestive"). Davis also notes that only he and one other person wore "gray shirts while the others wore white." (Doc. 28 at 89). But a "lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others." *United States v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005) (holding that "lineup was not unduly suggestive" where defendant "wore a blue T-shirt—in contrast to four of the other six people photographed—and the robber was alleged to have worn a blue T-shirt"). Davis offers no basis to conclude that the photopacks were unduly suggestive simply because he and another person were the only ones wearing gray shirts. *See Meeks v. Moore*, 216 F.3d 951, 968 (11th Cir. 2000) ("The source of this 'devastating[] suggestive[ness]' is that [defendant] was the only person in the line-up wearing both a yellow shirt and yellow pants,

and having no shoes. We fail to see how this is suggestive at all, and are completely at a loss to understand how it could be 'devastatingly suggestive.'").

Additionally, Davis points out that the other persons in the photopacks were 17 to 19 years old, while he was 29 years old. (Doc. 28 at 89; *see also Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-9 at 2710). But the trial court in the Headley case reviewed the photopacks and stated that "they all look[ed] about the same age group, and I would have guessed mid 20s."[7] *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 899. The trial court also noted that all six had "short hair" and "skin tones that [were] fairly similar." *Id.* Davis offers no basis to question these assertions. Thus, the age difference did not render the photopacks unduly suggestive. *See United States v. Collins*, 559 F.2d 561, 563 (9th Cir. 1977) (photopack not unduly suggestive where "[n]o significant difference in age [was] discernible in the photographs"). Lastly, Davis points out that the officer who conducted the photographic lineup "was an active investigator who knew Davis was a suspect and knew which picture was his." (Doc. 28 at 89). But "other than alleging the *potential* for an officer who knows which photograph contains the suspect to provide non-verbal cues," Davis has "presented no evidence of specific gestures or signals that the officer gave that influenced the identification[s]." *United States v. Smith*, 148 F. App'x 867, 874 (11th Cir. 2005); *see also United States v. Williams*, 688 F. App'x 895, 897 (11th Cir. 2017) (photographic lineup not unduly suggestive where, among other things, "[n]othing

[7] Similarly, Ortiz testified that "all" of the people in the photopack "look[ed] like they're between 25 and 30." *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 847.

evidence[d] that the officers made suggestive comments to [the witness] indicating which photograph he should select or otherwise pressured [him] to make an identification").

In short, a reasonable jurist could conclude that the photopacks were not unduly suggestive. Therefore, Davis is not entitled to relief on this claim.[8]

### F. Ground Five—Alleged *Giglio* and *Brady* Violations

Davis argues that the prosecution presented false testimony in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 1 at 68). At the BP bench trial, Officer Lynette Townsel stated that "she met with shooting victim Greisman at the Lake Wales Police Department on the day after the Headley incident." *Davis*, 383 So. 3d at 755. During the meeting, Officer Townsel "showed Greisman a photopack that included Davis's photograph, and Greisman quickly identified Davis as the shooter." *Id.* Over two years after the identification, "the State and the defense discovered that neither the original nor a copy of the photopack was located in evidence storage." *Id.* This "discovery set in motion an extensive search that led to Officer Townsel finding the original photopack in a shed at her home a few weeks later." *Id.*

At the BP bench trial, however, Officer Townsel claimed to have placed a "copy" of the photopack in the "Lake Wales Police Department property room." (Doc. 23-5 at 629). Davis's counsel cross-examined Officer Townsel on this point. (*Id.* at 632). He got her to admit that she was present when, in May 2010, the parties "review[ed] the evidence"

[8] Even if this claim were subject to *de novo* review, it would fail for the reasons explained above.

at the "State Attorney['s] Office." (*Id.*) Officer Townsel further admitted that, based on the "list of stuff we went through" during the meeting, no "copy" of the "Brandon Greisman photopack" was included in the evidence file. (*Id.*) Later, during postconviction proceedings, Davis uncovered a memorandum from Officer Townsel's personnel file indicating that she had failed to enter the Greisman photopack into evidence and that she was suspended without pay for three days for violating police procedure concerning the submission of evidence. (Doc. 23-12 at 102, 109).

Davis argues that a *Giglio* violation occurred when Officer Townsel falsely testified at the BP bench trial that "she placed a copy of the Greisman photopack into the property room at the Lake Wales Police Department." (Doc. 1 at 74). Likewise, Davis contends that the prosecution violated *Brady* by "failing to disclose" Officer Townsel's personnel file, which contained "valuable impeachment evidence" contradicting "her testimony at trial that she placed a copy of the Greisman photopack into evidence." (*Id.* at 73).

The Florida Supreme Court rejected both the *Giglio* and *Brady* claims. *Davis*, 383 So. 3d at 754-56. The court held that the *Giglio* claim failed because the State had "demonstrated beyond a reasonable doubt that Officer Townsel's testimony was not material." *Id.* at 755. The court explained that "during the cross-examination of Officer Townsel, defense counsel established that no copy of the photopack was placed in evidence storage." *Id.* Moreover, "the original photopack was introduced into evidence at trial, and both Greisman and Officer Townsel verified its authenticity during their testimony." *Id.* Thus, there was no basis to find that Officer Townsel's false testimony "improperly bolstered the authenticity of the original photopack and Greisman's in-court

identification." *Id.* The court also noted that "the photopack was not the only evidence admitted during the BP trial that identified Davis as the Headley shooter." *Id.* In support, the court pointed to the following pieces of corroborating evidence: (1) "[m]ultiple eyewitnesses testified to Bustamante's statement identifying Davis as the person who shot her"; (2) "eyewitness Ortiz saw Davis placing a gun into a bag shortly after Davis shot Greisman," he "was shown a photopack from which he quickly identified Davis, and that photopack was properly stored in evidence storage"; and (3) Ortiz also "identified Davis while on the witness stand and testified that he had seen Davis at a former worksite prior to the day of the Headley incident." *Id.* For these reasons, the court found "no reasonable possibility that the testimony contributed to Davis's conviction." *Id.*

The court rejected the *Brady* claim for similar reasons, finding that Davis "fail[ed] to demonstrate prejudice" from the withholding of Officer Townsel's personnel file. *Id.* at 756. The court reasoned that "Officer Townsel was impeached at trial on her mishandling of the photopack," and "[t]he trial court was aware that the original photopack was missing for more than two years and was found in 2010 in Officer Townsel's shed." *Id.* Additionally, the court reiterated that "the photopack was not the only evidence linking Davis to the Headley shooting." *Id.* As noted above, "[m]ultiple eyewitnesses overheard Bustamante identify Davis as the person who shot her," and "Ortiz identified Davis as the Headley shooter shortly after the incident and at trial." *Id.*

These rulings were reasonable. "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there

is any reasonable likelihood that the false testimony could have affected the judgment." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1107-08 (11th Cir. 2012) (internal quotation marks omitted). "To prevail on a *Brady* claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). Materiality under *Giglio* requires showing a "reasonable likelihood that the false testimony could have affected the . . . judgment." *Trepal*, 684 F.3d at 1108. Prejudice under *Brady* "is substantially more difficult" to show; it requires proof of "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*; *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 746 (11th Cir. 2010).

A fairminded jurist could agree with the Florida Supreme Court that Davis failed to show materiality under *Giglio* and prejudice under *Brady*. Both claims rest on the assertion that Officer Townsel falsely testified at the bench trial that she had "placed a copy of the Greisman photopack into evidence." (Doc. 1 at 73-74). As explained above, however, defense counsel addressed this testimony during his cross-examination of Officer Townsel, establishing that "no copy of the photopack was placed in evidence storage." *Davis*, 383 So. 3d at 755. Because the trial court "was made aware of the inconsistency" during Officer Townsel's cross-examination, "the 'false' testimony could not affect [its] judgment," and no *Giglio* violation occurred. *Tejada v. Dugger*, 941 F.2d 1551, 1557 (11th Cir. 1991); *see also United States v. Bueno-Sierra*, 99 F.3d 375, 380 (11th Cir. 1996) (false testimony not

material under *Giglio* where "[d]efense counsel fully explored every inconsistency alleged by the appellants when the trial judge re-opened cross-examination"). Likewise, any "prejudice [under *Brady*] was averted" because defense counsel "fully explored" Officer Townsel's false testimony on cross-examination. *Bueno-Sierra*, 99 F.3d at 379-80.

As the Florida Supreme Court explained, the *Giglio* and *Brady* claims fail for a separate reason: the prosecution presented substantial evidence other than the Greisman identification "linking Davis to the Headley shooting." *Davis*, 383 So. 3d at 756. Specifically, "[m]ultiple eyewitnesses overheard Bustamante identify Davis as the person who shot her," and "Ortiz identified Davis as the Headley shooter shortly after the incident and at trial." *Id.* In light of the "significant additional corroboration" of Greisman's identification, a reasonable jurist could conclude that Officer Townsel's false testimony was neither material nor prejudicial. *United States v. Noriega*, 117 F.3d 1206, 1219-20 (11th Cir. 1997) (no prejudice under *Brady* where "nondisclosure related only to a single corroborative witness's testimony from one area of the case"); *see also Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1286 (11th Cir. 2005) (state court reasonably found no materiality under *Giglio* "in light of the extensive and powerful corroborating evidence introduced" at trial).

### G. Ground Six, Sub-Claim A—Failure to Use BP Surveillance Footage

Davis faults trial counsel for failing to use the BP surveillance footage to challenge the prosecution's theory that "a lone perpetrator parked his car near BP, walked to BP, committed the crime, and then walked back to the car." (Doc. 1 at 75). The relevant portion of the footage depicts "a person running from the BP sign (where the shootings occurred)

toward the back of BP, where he goes offscreen." (*Id.* at 76; *see also* Doc. 23-12 at 273-93). Less than two seconds later, an SUV drives through the BP parking lot. (Doc. 23-12 at 287-93). The footage does not show the person getting into the SUV. (*Id.*) Davis nonetheless contends that counsel should have used the footage to "contradict the State's narrative that Davis alone committed this crime in his wife's Nissan Altima." (Doc. 1 at 76).

At the postconviction evidentiary hearing, counsel testified that he reviewed "all of the surveillance evidence" in preparation for the BP trial. (Doc. 23-12 at 635). Counsel also retained a "video expert" to "do video enhancement, video analysis, a number of different things related to video evidence." (*Id.* at 641). After consulting with the expert and reviewing the footage "[n]umerous times," counsel concluded that the footage did not support "the argument that there were two people involved in the commission of this crime at BP." (*Id.* at 649, 652). Counsel explained that he did not "see that [SUV] as being [a] get-away vehicle based on the physical evidence," and that "[f]or me to argue there was a get-away driver would have been—above and beyond that car, would have been pure speculation." (*Id.* at 654).

The Florida Supreme Court held that counsel's "performance was not deficient" because he "evaluated the surveillance video and made a strategic decision not to rely on it to argue the possibility of a second perpetrator." *Davis*, 383 So. 3d at 758-59. The court reasoned that (1) "counsel testified that he carefully reviewed the surveillance footage and hired an expert to review it and advise the defense team," (2) "[i]n consultation with the expert and the defense team, counsel concluded that nothing seen on the video supported a

theory that two people were involved in the crimes," and (3) "counsel concluded that the surveillance footage could not have been used to challenge the State's theory." *Id.* at 758. The court found that the "mere fact that the video shows an SUV approach nearby as the perpetrator ran back towards the store after killing two men fails to show any involvement by another individual." *Id.* Additionally, the court noted that "four witnesses testified that they saw a vehicle resembling Victoria Davis's Nissan Altima near the BP on the night of the murders, and the State presented evidence that tire casts made from the area where the car was seen were consistent with the tires on that car." *Id.*

The Florida Supreme Court reasonably concluded that counsel was not deficient for failing to use the BP surveillance footage in the manner proposed by Davis. As explained above, a strategic decision by counsel "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." *Dingle*, 480 F.3d at 1099. "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks*, 975 F.3d at 1176. Thus, to prevail on his ineffective-assistance claim, Davis must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Franks*, 975 F.3d at 1176.

Davis cannot make the necessary showing. As set forth above, counsel reviewed the surveillance footage and, in consultation with a "video expert," concluded that it did not support "the argument that there were two people involved in the commission of this crime at BP." (Doc. 23-12 at 649, 652). A competent attorney could refrain from using the footage

to argue that a second perpetrator was involved, especially since "[t]he mere fact that the video shows an SUV approach nearby as the perpetrator ran back towards the store after killing two men fails to show any involvement by another individual." *Davis*, 383 So. 3d at 758. Indeed, the footage does not show the perpetrator entering the SUV or otherwise interacting with its driver. (Doc. 23-12 at 287-93). On this record, a competent attorney could agree with counsel that it "would have been pure speculation" to argue that the SUV was a get-away vehicle. (*Id.* at 654). Moreover, the prosecution could counter any suggestion of a get-away driver by pointing to the four eyewitnesses who "saw a vehicle resembling Victoria Davis's Nissan Altima near the BP on the night of the murders," and to the "evidence that tire casts made from the area where the car was seen were consistent with the tires on that car." *Davis*, 383 So. 3d at 758. Thus, a fairminded jurist could conclude that counsel's decision not to use the surveillance footage "fell within the wide range of reasonable professional conduct."[9] *Franks*, 975 F.3d at 1176; *see also Allison v. Sec'y, DOC*, No. 2:13-cv-861-SPC-MRM, 2015 WL 4620558, at *8 (M.D. Fla. July 31, 2015) (counsel acted "within the realm of reasonable trial strategy" when he "viewed the [surveillance] videotape prior to trial and chose not to use it" because he "did not believe that the tape was exculpatory or probative").

[9] In his reply, Davis appears to suggest that other portions of the BP surveillance footage could have aided his defense. (Doc. 28 at 106-07). But the footage does not support a colorable argument that someone other than Davis was involved in the attempted robbery and murders. (Doc. 23-11 at 2-140).

### H. Ground Six, Sub-Claim B—Failure to Present Evidence of Lost Dashcam Footage

Davis argues that trial counsel "should have confronted the State's law enforcement witnesses from the Headley case with the evidence that there was dashcam footage from the Headley scene that went missing." (Doc. 28 at 109). After the Headley incident, "Lake Wales Police Sergeant Griffin Crosby filed a supplemental report indicating that he retrieved dashboard camera footage from the police car of another officer who reported to the Headley scene." *Davis*, 383 So. 3d at 741. The supplemental report explained:

> On 12/27/2007, I recovered the video hard drive from Officer Hampton's in-car video system. I then transferred the video images to the Digital Eyewitness Media Manager (DEMM). The server is secured with limited access. I then transferred the video images from the DEMM, to a Digital Video Disc (DVD). The disc was turned over to the Property/Evidence Custodian. At this time, I have no further information regarding this case.

*Id.* Defense counsel did not obtain the footage. *Id.* During a June 2010 deposition, however, Sergeant Crosby testified "that the footage captured (1) the scene as the responding officer drove onto the Headley parking lot, (2) the Headley building itself, and (3) the movement of various individuals such as emergency personnel. *Davis*, 383 So. 3d at 759.

Davis contends that counsel should have obtained the video and used it to "contest the eyewitness testimony of th[e] Headley witnesses during the BP trial." (Doc. 28 at 112). Even if the video were unavailable, counsel allegedly could have "used its disappearance as grounds for cross-examination of several witnesses by showing that law enforcement failed to preserve critical evidence."[10] (*Id.*)

---

[10] During the state postconviction proceedings, Davis unsuccessfully attempted to obtain the video footage. (Doc. 1 at 77-78).

The Florida Supreme Court reasonably rejected this claim. *Davis*, 383 So. 3d at 759. As the court explained, "deposition testimony in the record indicate[d] that the footage at issue was extremely limited in nature." *Id.* Specifically, Sergeant Crosby explained that the footage captured "(1) the scene as the responding officer drove onto the Headley parking lot, (2) the Headley building itself, and (3) the movement of various individuals such as emergency personnel." *Id.* As the court correctly noted, this testimony "undermine[d] Davis's assertion that the footage could have been used to impeach Lieutenant Elrod's testimony or otherwise disprove that Davis committed the crimes at Headley." *Id.* Indeed, as the court put it, "[t]here [was] nothing to indicate any of the contents of this video [were] exculpatory or helpful in any way to [] Davis and any such assertions [were] based on mere speculation." *Id.* In short, nothing in the record suggests that the missing footage would have aided the defense, nor is there any reasonable probability that the verdict would have been different had the trial court learned that the (apparently inconsequential) footage went missing. Davis's arguments to the contrary are speculative and cannot support relief under *Strickland*.[11] *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) (noting that "speculation that the missing [evidence] would have been helpful" is "insufficient to carry the burden of a habeas corpus petitioner"); *Aldrich v. Wainwright,* 777 F.2d 630, 636 (11th

[11] Davis contends that this claim is subject to *de novo* review because the Florida Supreme Court "did not conduct an independent merits assessment of the claim under *Strickland*." (Doc. 28 at 111). But the court did address the merits of the claim. As explained above, it held that Davis's assertion of ineffective assistance failed because the evidence refuted his speculative allegation that the footage would have aided the defense. *Davis*, 383 So. 3d at 759. That is an adjudication on the merits. *See Maddox v. Tucker*, No. 11-14180-CIV, 2012 WL 13176114, at *8 (S.D. Fla. Feb. 14, 2012) ("Speculative and conclusory claims are inadequate as a matter of law to raise a claim of ineffective assistance of counsel that merits relief."), *adopted by* 2012 WL 13176115 (S.D. Fla. Apr. 24, 2012). Regardless, for the reasons stated above, Davis's claim fails even under *de novo* review.

Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

### I. Ground Six, Sub-Claim C—Failure to "Aggressively Litigate" Motion to Suppress Based on "Stale" Search Warrant

Davis argues that trial counsel was ineffective for failing to "aggressively litigate a motion to suppress the fruits of a stale search warrant." (Doc. 1 at 79). One day after the incident at Headley Insurance, law enforcement obtained and executed a search warrant for Davis's wife's Nissan Altima, the car he drove to the Headley robbery. *Davis*, 383 So. 3d at 759. Several pieces of evidence were recovered from the car, including "Davis's driver license," "two dark-colored jackets," and "a pair of black gloves." *Id.* at 749. Although the search warrant was executed in December 2007, a complete copy of the warrant was not returned to the issuing judge until September 2008. *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 32-3 at 818.

In the Headley case, Davis moved to suppress the evidence recovered from the car, arguing (among other things) that the search warrant was "defective" because it was not returned to the judge within ten days of issuance, as required by Fla. Stat. § 933.05(2). *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 979-80. At the hearing on the motion, *id.* at 992, the trial court cited *State v. Featherstone*, a Florida appellate decision holding that § 933.05 "does not make void warrants which have been executed, by the subsequent failure of the officer to make return thereon." 246 So. 2d 597, 599 (Fla. 3d DCA 1971). *Featherstone* explained that "[w]hile it is the duty of the officer serving the search warrant to make due return when the same is served, nevertheless, the failure to do this will not

have a retroactive effect to render void a search that was valid at the time it was made." 246 So. 2d at 599. Suppression might be appropriate, however, "if it appears that a failure by the officer to observe the statute and make due return results in any prejudice to the defendant." *Id.*

Citing *Featherstone*, the trial court stated that it could not "think of any prejudice [Davis] ha[d] by delaying the return" of the warrant. *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-4 at 992. It invited defense counsel to "articulate some type of prejudice," and counsel responded, "If I could, I would." *Id.* at 995. The court then held that "without [Davis] being able to demonstrate some degree of prejudice," the late return did not render the warrant void. *Id.* at 996-97.

Davis contends that counsel provided ineffective assistance because, "rather than zealously advocate for his client regarding the prejudice from the late return, [he] acquiesced to the trial court that the motion to suppress was not supported by case law." (Doc. 28 at 115-16). The Florida Supreme Court disagreed, holding that the postconviction court "did not err" in rejecting this claim without an evidentiary hearing. *Davis*, 383 So. 3d at 760. As the Florida Supreme Court explained, Davis could not prevail on his ineffective-assistance claim unless he "prove[d] that his [underlying] Fourth Amendment claim [was] meritorious." *Id.* (internal quotation marks omitted). Davis could not make that showing because, as both the "trial court" and the postconviction court found, "the timely executed search warrant was valid despite the delayed warrant return." *Id.*

The Florida Supreme Court then considered whether Davis suffered prejudice from the failure to obtain suppression of the evidence. It noted that, "even if a motion to suppress

would have been granted, [Davis] must show that there is a reasonable probability the result of the proceeding would have been different if not for counsel's error." *Id.* (internal quotation marks omitted). The court found that Davis could not meet this standard. *Id.* According to the court, "the evidence retrieved from Victoria Davis's Nissan Altima and admitted during the Headley trial was not the only evidence that linked Davis to the Headley incident." *Id.* The court explained that "[a]lthough only a limited amount of Headley evidence was admissible during the BP trial, the trial court properly admitted evidence that Bustamante, as testified to by Lieutenant Elrod and other eyewitnesses, identified Davis as the person who shot her." *Id.* Moreover, "the State introduced evidence that the bullet removed from Bustamante's hand was consistent with the bullets removed from the BP victims' heads, and the State's firearms expert testified that (1) all of the bullets and bullet fragments were fired from the same firearm, and (2) all had rifling characteristics consistent with the Dan Wesson .357 magnum that Davis bought on the day of the BP murders." *Id.*

The Florida Supreme Court reasonably rejected Davis's ineffective-assistance claim. To prevail on this claim, Davis needed to show "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006).

As an initial matter, Davis fails to establish a meritorious Fourth Amendment claim. Davis does not dispute that there was probable cause to search the Nissan Altima, nor does

he allege that any irregularities occurred *before* law enforcement obtained the search warrant. Thus, at the time of the search, Davis's "rights under the Fourth Amendment were not being infringed." *United States v. Hall*, 505 F.2d 961, 963 (3d Cir. 1974). "The irregularity occurred only after a valid search and seizure," and "such irregularity is not constitutionally significant under the Fourth Amendment." *Id.* (holding that Fourth Amendment did not require suppression based on "government agent's failure to promptly make a search warrant return" in violation of Federal Rule of Criminal Procedure 41). Regardless, Davis fails to show that the late return of the search warrant "result[ed] in any prejudice to" him. *Featherstone*, 246 So. 2d at 599. For example, he does not contend that the delay prevented him from analyzing the seized evidence or challenging its admissibility. Indeed, the search warrant was returned to the issuing judge in September 2008, and Davis's first trial did not occur until October 2010. *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 32-3 at 818; Doc. 32-5 at 377.

Furthermore, a fairminded jurist could agree that there is no "reasonable probability that the verdict would have been different absent the [allegedly] excludable evidence." *Zakrzewski*, 455 F.3d at 1260. Even setting aside the items recovered from the Nissan Altima, the prosecution presented "substantial evidence" that Davis committed the crimes at Headley Insurance. *Fugate v. Head*, 261 F.3d 1206, 1224 (11th Cir. 2001); *see also McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) ("[T]he other substantial evidence of [petitioner's] guilt negates any possibility of prejudice resulting from his attorney's [alleged deficiencies]."). The Florida Supreme Court accurately recounted the significant evidence against Davis. *Davis*, 383 So. 3d at 760. Given the strength of the

prosecution's case, a fairminded jurist could agree with the Florida Supreme Court's finding of no prejudice. *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice.").

### J. Ground Six, Sub-Claim D—Failure to Move to Suppress Based on Chain-of-Custody Issue

According to Davis, trial counsel should have moved to suppress Greisman's identification based on a "break" in the photopack's "chain of custody." (Doc. 1 at 82-83). As explained above, "[g]iven the State's evidence that the same firearm was used in the Headley and BP incidents, the State relied on Greisman's identification of Davis as the Headley shooter as a part of its proof that Davis was the BP shooter." *Davis*, 383 So. 3d at 760. Over two years after the identification, "the State and the defense discovered that neither the original nor a copy of the photopack was located in evidence storage." *Id.* at 755. This "discovery set in motion an extensive search that led to Officer Townsel[, the officer who showed Greisman the photopack,] finding the original photopack in a shed at her home a few weeks later." *Id.* During the BP bench trial, "Greisman . . . verified the authenticity of the original photopack, and he identified Davis from the witness stand." *Id.* at 760. Davis now argues that counsel provided ineffective assistance by failing to "move to suppress based on the chain-of-custody violation." (Doc. 28 at 117).

The Florida Supreme Court rejected Davis's ineffective-assistance claim. It held that "[c]ounsel was not deficient for failing to file a motion to suppress based on chain of custody, as there was no basis for suppression." *Davis*, 383 So. 3d at 760. The court

explained that, under Florida law, "to suppress the photopack, Davis would have been required to establish probable tampering." *Id.* (citing *Peek v. State*, 395 So. 2d 492, 495 (Fla. 1980)). It rejected as "speculation" Davis's claim that "the photopack was tampered with during the time that it was not in evidence storage." *Id.* at 760-61. In doing so, it adopted the postconviction court's reasoning:

> Clearly, Officer Townsel did not follow the proper procedure by failing to place the photo pack securely in evidence immediately after [] Greisman made the identification. However, [] Davis has offered only speculation that the location of the photo pack prior to being placed into evidence resulted in tampering. Such bare allegations are insufficient to render the evidence inadmissible. *See Terry v. State*, 668 So. 2d 954, 959 n.4 (Fla. 1996); *Bush v. State*, 543 So. 2d 283, 284 (Fla. 2d DCA 1989). Instead, the testimony from Officer Townsel and [] Greisman reflect[s] the original was entered into evidence at the time of trial. As Officer Townsel testified at the evidentiary hearing, the photo pack was unaltered in any way.

*Id.* at 761. Thus, the Florida Supreme Court held that "because Davis . . . failed to demonstrate that the photopack identification was tainted," he "could not have prevailed on a motion to suppress based on chain of custody." *Id.*

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The Florida Supreme Court held that, as a matter of Florida law, the motion to suppress would have failed because Davis did not establish "probable tampering" with the photopack. *Davis*, 383 So. 3d at 760-61. Thus, the Florida Supreme Court "already has told us how the issues would have been resolved under Florida state

law had [counsel] done what [Davis] argues [they] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1352 (11th Cir. 2024) (federal court owes "unconditional deference to a state high court's decision of a state-law issue in a federal habeas case"); *Spears v. Sec'y, Dep't of Corr.*, No. 8:20-cv-3011-KKM-AEP, 2023 WL 8436316, at *8 (M.D. Fla. Dec. 5, 2023) ("This Court must defer to the state court's determination that a motion to suppress evidence of the firearm based on a chain of custody argument would have been unsuccessful.").

Because the Florida Supreme Court "authoritatively decided as a matter of [Florida] law" that the chain-of-custody argument lacked merit, the remainder of the analysis is straightforward. *Calhoun*, 92 F.4th at 1351. "[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994). Thus, the Florida Supreme Court reasonably concluded that counsel did not render ineffective assistance by failing to argue that the chain-of-custody issue required suppression.[12]

### K. Ground Seven—Shifting the Burden of Proof

According to Davis, the trial court "impermissibly shifted the burden of proof to [him] to disprove his presence at BP" when it explained its guilty verdict in the sentencing

---

[12] Deference aside, Davis fails to point to "sufficient evidence to establish a probability of tampering, which would support exclusion of the evidence." *Overton v. State*, 976 So. 2d 536, 552 (Fla. 2007). Both Greisman and Officer Townsel testified that the photopack was authentic. *Davis*, 383 So. 3d at 755, 760. And nothing in the record suggests that the photopack was altered while it was stored in the shed. As the Florida Supreme Court explained, Officer Townsel clearly did not follow proper procedure for storing evidence, but "[a] mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence." *State v. Jones*, 30 So. 3d 619, 622 (Fla. 2d DCA 2010).

order. (Doc. 1 at 85). In the "Analysis of Guilt" section of the sentencing order, the court wrote the following: "On the evening of December 7, 2007, [] Davis left his home sometime between 6:00 p.m. and 7:00 p.m. in his wife's Nissan Altima, allegedly to go shopping. His whereabouts are unknown until he returned sometime after 9:00 p.m. to 9:30 p.m. [] Davis claims he was at the Eagle Ridge Mall, *but there is no evidence whatsoever to corroborate that claim*." (Doc. 23-4 at 859 (emphasis added)). Davis contends that the court's "comments on the lack of corroborating evidence to show [he] was at the Eagle Ridge Mall unconstitutionally placed the burden on [him] to prove his innocence." (Doc. 1 at 86).

The Florida Supreme Court rejected Davis's "burden-shifting argument [as] without merit." *Davis*, 207 So. 3d at 194. After setting out the relevant passage from the sentencing order, the court explained that Davis's "alibi failed to raise a reasonable doubt in the trial court's mind as to whether [he] was at the BP at the time of the murders." *Id.* Therefore, the "trial court's comment . . . merely reveal[ed] the deficiency of Davis's alibi defense." *Id.* Because no burden-shifting occurred, the Florida Supreme Court held that Davis was "not entitled to relief." *Id.*

This ruling was reasonable. "[T]he government in a criminal proceeding has the burden of proving every element of the charged offense beyond a reasonable doubt." *United States v. Nerey*, 877 F.3d 956, 970 (11th Cir. 2017). Thus, "a defendant does not have to disprove anything nor prove innocence, and state-created presumptions to the contrary are violative of due process." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). Here, however, the trial court did not place the burden on Davis to prove his

innocence. The court never suggested that Davis "*should have produced* or *needed to* produce evidence corroborating his story in order to establish his innocence." *United States v. Sosa*, 208 F. App'x 752, 757 (11th Cir. 2006). Rather, the court merely "commented on the evidence presented at trial" and "emphasized the lack of evidence corroborating [Davis's] story." *Id.* Such comments do not show that the court shifted the burden of proof to Davis. *See United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011) (no improper burden-shifting from comments that "pertain[ed] to [defendant's] inability to corroborate her work for the CITY Program" because they merely "tested the plausibility of [her] account"). Moreover, "[t]rial judges are presumed to know the law and to apply it in making their decisions," and Davis fails to overcome the presumption that the court applied the proper burden of proof in this case. *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997); *see also Davis v. Davis*, No. 1:09-cv-10748, 2012 WL 511492, at *8 (E.D. Mich. Feb. 16, 2012) ("A trial court conducting a bench trial . . . need not make explicit the standard it is following because it is presumed to follow the law in reaching a verdict.").

### L. Ground Eight—Denial of Motion for Judgment of Acquittal

Davis contends that the trial court "erred in denying [his] motion for judgment of acquittal because the State failed to show that [he was] the person to commit the crimes in the BP case." (Doc. 1 at 86). According to Davis, "[e]ven in the light most favorable to the State, the State's evidence was insufficient to show beyond a reasonable doubt that [he] was the BP perpetrator." (Doc. 28 at 127). The Florida Supreme Court reasonably concluded that Davis's sufficiency challenged lacked merit because "the State introduced

competent, substantial evidence of guilt sufficient to affirm [his] convictions." *Davis*, 207 So. 3d at 197.

Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard does not require the prosecution "to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the factfinder is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.* The *Jackson* standard "is equally applicable to direct or circumstantial evidence." *Martin v. State of Alabama*, 730 F.2d 721, 725 (11th Cir. 1984).

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Davis cannot meet this demanding standard. In rejecting Davis's sufficiency challenge, the Florida Supreme Court accurately summarized the substantial evidence of his guilt:

> On December 7, 2007, Leon Davis purchased a .357 magnum Dan Wesson revolver from his cousin. That evening, Davis left home alone between 6 and 7 p.m., driving a black Nissan Altima. Around 8:51 p.m., a man fitting Davis's description attempted to enter the BP convenience store. When he could not gain entry, he fired a gunshot into the store. The man then ran

> across the parking lot and shot Dashrath and Pravinkumar in the head. The man ran back to the front door of the store, tried again to open it, raised the gun again, and then ran away.
>
> Around the time of the attempted robbery and murders, four witnesses saw a dark-colored, likely black car parked in a secluded area in the vicinity of the BP. One of the witnesses definitively identified the car as a Nissan and described the car's distinctive grille on the front end. These descriptions are consistent with the black Nissan Altima that Davis admitted he was driving when he left home on the evening of the murders. Testing later revealed that the tire tracks found near the BP were consistent with the tires on the Altima driven by Davis.
>
> Two days after the murders, Davis remained in possession of the gun he purchased from his cousin and showed it to his mother. Four days later, Davis robbed the Headley Insurance Agency. He shot one of the employees, Yvonne Bustamante, in her left hand, and a concerned neighbor, Brandon Greisman, in the face. Bustamante identified Davis by name, as she knew Davis as a Headley customer. Greisman and another neighbor, Carlos Ortiz, identified Davis from photographic lineups shown shortly after the events at Headley. Ortiz also observed a black Nissan parked in an area behind a vacant house around the time of the Headley shootings.
>
> Projectiles retrieved from the Headley crime scene and from Bustamante's autopsy were compared with the projectiles retrieved from the BP crime scene and from the autopsies of Dashrath and Pravinkumar. The projectiles were fired from the same gun, a gun whose rifling characteristics are consistent with the .357 magnum Dan Wesson revolver purchased by Davis on the same day as the BP murders. In sum, the same gun was used to murder Dashrath and Pravinkumar on December 7 as was used to shoot Bustamante and Greisman just days later, and Bustamante identified Davis as the shooter based on her personal knowledge of Davis. A car fitting the description of the black Nissan Altima driven by Davis was seen near both crime scenes.

*Davis*, 207 So. 3d at 196.

Viewed "in the light most favorable to the prosecution," this evidence would allow a "rational trier of fact" to find beyond a reasonable doubt that Davis committed the BP offenses. *Jackson*, 443 U.S. at 319. Therefore, it was not "objectively unreasonable" for the Florida Supreme Court to reject Davis's sufficiency challenge. *Cavazos*, 565 U.S. at 2.

**M. Ground Nine, Sub-Claim A—Alleged Reliance on Facts Not in Evidence**

Davis argues that the trial court violated his constitutional rights by failing "to confine [its] decision to the evidence presented at the BP trial and instead consider[ing] facts not in evidence." (Doc. 1 at 92). As explained above, the court "entered a narrow [pretrial] ruling" that allowed the prosecution to present the following evidence from the Headley case: "eyewitness testimony identifying Davis as the Headley shooter, placing a black Nissan in the vicinity of the Headley building at the time of the shootings, and establishing that the same gun was used in both the BP and the Headley shootings." *Davis*, 207 So. 3d at 189. Additionally, to prevent the Headley evidence from becoming a "feature of the case," the court excluded certain highly prejudicial details of the Headley incident, including the arson of the building, Davis's lighting the victims on fire, and the "condition of the victims." (Doc. 23-3 at 946-47)

Davis contends that, despite these measures, the court evaluated his guilt in the BP case by relying on the verdict in the Headley case and "details about the Headley case . . . that were not presented by the State" at the BP trial. (Doc. 1 at 91-92). To support this assertion, Davis relies on the following portions of the court's sentencing order:

> On December 13, 2007, *a robbery and two murders occurred* at the Headley Insurance Agency in Lake Wales, Florida.
>
> . . .
>
> On Thursday, December 13, 2007, the Headley Insurance Agency in Lake Wales *was robbed and Yvonne Bustamonte [sic] and Juanita "Jane" Luciano were bound with duct tape, saturated with gasoline, and set on fire*. They died as a result of their injuries.
>
> . . .

> *The Jury in case number CF07-009386 found, beyond and to the exclusion of all reasonable doubt that the Defendant, Leon Davis, Jr., was the tall black male involved in the Headley Insurance Agency robbery and murders*. He was seen wielding and shooting a firearm during those crimes. The Court finds that the same firearm fired the projectiles that were recovered during the investigation of the crimes occurring at the BP Station.
>
> . . .
>
> The circumstantial and non-circumstantial evidence concerning the Headley Insurance Agency crimes proves, beyond a reasonable doubt, that Leon Davis, Jr. robbed the Headley Insurance Agency and killed Yvonne Bustamonte [*sic*] and Juanita "Jane" Luciano *as was found by the Jury in that case*.
>
> . . .
>
> The evidence comes down to this; Leon Davis, Jr. was positively identified as the gun wielding perpetrator of the Headley Insurance Agency crimes *and was convicted of those crimes*.

(Doc. 23-4 at 853, 857-60 (emphasis added)).

The Florida Supreme Court rejected Davis's argument, holding that the trial court did not rely on "facts outside of the guilt phase record in determining his guilt for the BP crimes." *Davis*, 207 So. 3d at 193. Based on its "review of the sentencing order," the Florida Supreme Court found that "the trial court was simply setting forth the historical facts of this case." *Id.* at 192. As the Florida Supreme Court explained, the trial court held a pretrial hearing and "concluded that during the guilt phase, the State would not be permitted to introduce evidence of the fire and the events inside Headley." *Id.* This "order was assiduously followed" during the bench trial. *Id.* Indeed, "to a person, the testimony of each of the[] [Headley] witnesses carefully avoided any comment on the facts surrounding what actually happened inside of Headley, the victims' burn conditions, and

events that occurred later that day." *Id.* at 193. For instance, "Fran Murray, Evelyn Anderson, Lt. Elrod, and the medical personnel, who offered graphic testimony about Bustamante's condition during the Headley trial, did not refer to this evidence during the BP trial." *Id.* Nevertheless, "the entire Headley record was admitted during the penalty phase of the BP trial, and evidence that was specifically excluded from the guilt phase was admitted during the penalty phase." *Id.*

According to the Florida Supreme Court, "Davis's argument that the [trial] court relied on facts outside of the guilt phase record in determining his guilt for the BP crimes [was] inconsistent with the record evidence of the court's caution to avoid the introduction of irrelevant and prejudicial Headley evidence during the guilt phase." *Id.* Thus, the Florida Supreme Court "was convinced that the trial court did not rely on such facts to establish Davis's guilt in the BP case and was merely setting forth the historical context of the case." *Id.*

This ruling was reasonable. A defendant "accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *see also United States v. Garcia*, 439 F.3d 363, 366-68 (7th Cir. 2006) ("The presumption [of innocence] is violated . . . when the [factfinder] is encouraged (or allowed) to consider facts which have not been received in evidence"). Here, the Florida Supreme Court found that the trial court did not rely on "facts outside of the guilt phase record in determining [Davis's] guilt for the BP crimes." *Davis*, 207 So. 3d at 193. Instead, the challenged portions of the sentencing order "merely set[] forth the historical context of the case." *Id.* On federal habeas review, these factual findings

"are presumed to be correct," and that presumption can be overcome only "by clear and convincing evidence." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (quoting 28 U.S.C. § 2254(e)(1)); *see also Parker v. Dugger*, 498 U.S. 308, 320 (1991) (holding that "a determination of what the trial judge found is an issue of historical fact").

Davis cannot satisfy this demanding standard. First, the guilt-phase proceedings support the finding that the trial court respected the limits on the Headley evidence. As the Florida Supreme Court explained, the trial court was careful "to avoid the introduction of irrelevant and prejudicial Headley evidence during the guilt phase." *Davis*, 207 So. 3d at 193. The pretrial order was "assiduously followed" during the bench trial, with each Headley witness "carefully avoid[ing] any comment on the facts surrounding what actually happened inside of Headley, the victims' burn conditions, and events that occurred later that day." *Id.* at 192-93. These precautions strongly suggest that the court understood and respected the limits on the evidence it could use to determine Davis's guilt. *See Guzman v. State*, 868 So. 2d 498, 511 (Fla. 2003) ("Given the[] evidentiary rulings [excluding inadmissible evidence], the judge *a fortiori* may be presumed to have disregarded the inadmissible evidence.").

Second, the sentencing order identified guilt-phase evidence supporting the verdict independently of the excluded Headley evidence. In the "Analysis of Guilt" section, the court expressly stated that "the facts concerning the firearm used during the BP Station crimes and the Headley Insurance Agency crimes [were] of paramount importance." (Doc. 23-4 at 858). The court explained that the projectiles recovered from both scenes were "all

fired from the same weapon." (*Id.*) Moreover, Davis "was positively identified as the person wielding the firearm . . . at the Headley Insurance Agency crime scene," and the "same weapon was used at the BP Station on December 7, 2007," by someone who "fit[] [Davis's] physical description." (*Id.*) This reasoning did not depend on the guilty verdict in the Headley case, nor did it rest on the manner in which the Headley victims were restrained, burned, or killed.

Similarly, after noting that Davis was "positively identified" as the "gun-wielding" perpetrator of the Headley crimes, the court summarized the case against him as follows:

> [The] same gun that was used at the Headley crime scene was used at the BP station by a tall black man who, after murdering the two Patel victims, headed north on foot towards an area where a black Nissan automobile, with a noteworthy grille, was seen parked, backed into a cattle gap area. That car left tire tracks that correspond to the tires on the black Nissan Altima being driven by Leon Davis, Jr. on December 7, 2007. Leon Davis, Jr. bought a Dan Wesson .357 revolver on December 7, 2007, admits to having it that evening, showing it to his mother on December 9, 2007, and was seen in possession of a firearm at Headley Insurance Agency on December 13, 2007. The three projectiles fired from a gun used at the Headley Insurance Agency office are identical to the projectiles recovered from the BP Station crime scene and were all fired from the same .38/.357 caliber class of firearm, which includes the Dan Wesson .357 firearm purchased by Leon Davis, Jr. from his cousin, Randy Black.

(*Id.* at 860). Again, the Headley verdict and the excluded details concerning the Headley crimes played no role in this chain of reasoning.

In short, Davis fails to show "by clear and convincing evidence" that the Florida Supreme Court erred when it concluded that the trial court did not rely on evidence outside the record in adjudicating his guilt. *Pye*, 50 F.4th at 1035. Thus, Davis is not entitled to relief.

### N. Ground Nine, Sub-Claim B—Alleged Reliance on Prior Felony Convictions

Davis contends that the trial court violated his constitutional rights by relying on his prior convictions for grand theft as a "basis for finding [him] guilty of murder and attempted robbery in the BP case." (Doc. 1 at 92). In July 2007—several months before the BP incident—Davis "was convicted of felony grand theft and sentenced to probation." *Davis*, 207 So. 3d at 194. As Davis points out, the prior convictions were admitted "for the limited purpose of the trial court's finding that [he] was a felon in possession of a firearm." (Doc. 1 at 92). Davis contends, however, that the court went further and considered his prior convictions "as proof of guilt for the murder, attempted murder, and attempted armed robbery [at the] BP." (*Id.* at 94).

To support this assertion, Davis relies on the following portion of the sentencing order:

> The circumstantial and non-circumstantial evidence concerning the Headley Insurance Agency crimes proves, beyond a reasonable doubt, that Leon Davis, Jr. robbed the Headley Insurance Agency and killed Yvonne Bustamonte [*sic*] and Juanita "Jane" Luciano as was found by the Jury in that case. The gun used in those crimes was also used to murder Pravinkumar C. Patel and Dashrath Patel. Beyond the fact that the Defendant purchased a Dan Wesson .357 revolver from Randy Black and all six projectiles recovered from the two crime scenes are consistent with having been shot from the same type of firearm, there are numerous other circumstantial facts that lead to the conclusion, beyond a reasonable doubt, that Leon Davis, Jr. committed the BP murders.
>
> Leon Davis, Jr. was facing some very serious financial setbacks. He did not have a job, and his wife was on leave from her employment due to a problem pregnancy. His credit cards were maxed out, and he only had a few dollars in his accounts at Mid Florida Federal Credit Union. He was behind on his mortgage payments, and he owed money on a loan to the bank. He had even given up his cell phone. Due to an inability to pay his insurance payments,

> he parked his Nissan Maxima and was using his wife's car. He was also facing his son's, Garrion's, upcoming birthday and the Christmas holidays.
>
> In spite of his financial difficulties, [] Davis decided to purchase a gun and spent $220.00 on a Dan Wesson .357 revolver. *This is a very strange purchase, and an unlawful act, in light of the fact that the Defendant was a convicted felon on felony probation at the time of his acquisition of the firearm.*

(Doc. 23-4 at 859 (emphasis added)).

The Florida Supreme Court reviewed the italicized language and concluded that it did not prove "the trial court considered [Davis's] felony convictions as proof of his guilt on all of the charged offenses." *Davis*, 207 So. 3d at 195. According to the Florida Supreme Court, the "language emphasized by Davis must be read in context." *Id.* Viewed in the context of the sentencing order as a whole, the relevant language did not show that the trial court "conclude[d] that Davis committed the BP crimes because he was a convicted felon. Rather, the trial court focused on Davis's purchase of the revolver before the BP crimes." *Id.* Indeed, "[t]he fact that Davis purchased a .357 magnum revolver on the same day of the BP crimes [was] circumstantial evidence of his guilt." *Id.*

The Florida Supreme Court reasonably concluded that, read in context, the sentencing order did not show that the trial court inferred Davis's guilt in the BP case from his status as a convicted felon. This interpretation of the sentencing order is a factual finding that is "presumed to be correct," and Davis fails to present "clear and convincing evidence" to overcome the presumption of correctness. *Pye*, 50 F.4th at 1035; *see also Parker*, 498 U.S. at 320 (holding that "a determination of what the trial judge found is an issue of historical fact").

In the relevant passage of the sentencing order, the trial court described Davis's unemployment, exhausted credit, delinquent mortgage payments, and inability to meet ordinary expenses before observing that, "[i]n spite of his financial difficulties," he spent $220 on a revolver. (Doc. 23-4 at 859). Spending scarce funds on a handgun while forgoing ordinary expenses supported an inference that Davis bought the revolver as a prelude to obtaining money through robbery. That inference was strengthened by the fact that Davis bought the weapon on the day of the BP crimes. (*Id.* at 860). On this reading of the sentencing order, Davis's financial distress and the timing of the purchase explained why the expenditure was suspicious, while his felony status explained the separate observation that acquiring the revolver was unlawful. Thus, the surrounding discussion supports the Florida Supreme Court's finding that the incriminating inference rested on the gun purchase, not the prior felony convictions.

Because this interpretation "find[s] fair support in the record," the Court must accept it on federal habeas review. *Wainwright v. Goode*, 464 U.S. 78, 85 (1983). Therefore, Davis cannot prevail on his claim that the trial court impermissibly considered his prior convictions as proof of guilt.

### O. Ground Ten—Failure to Adequately Investigate and Present Mitigation

Davis contends that trial counsel was ineffective for failing to "adequately investigate and present readily available mitigating evidence during [the] penalty phase." (Doc. 1 at 95). According to Davis, counsel "failed to seek out readily available records concerning Davis and his family; failed to interview family members and others with relevant information; and failed to seek the appropriate mental health experts to assist in

the investigation and presentation of mitigating evidence and the evaluation of Davis's mental state at the time of the crime and the trial." (*Id.*) Davis argues that "[a] more fulsome investigation would have quickly produced far more accurate and compelling mitigation than was presented, and there is a reasonable probability that Davis would not have been sentenced to death." (*Id.*)

Respondents contend that this claim is unexhausted and procedurally defaulted. (Doc. 22 at 95-99). The Court need not reach that issue because, even under *de novo* review, the claim fails on the merits. *See Dallas*, 964 F.3d at 1307 ("As we have said many times and as the Supreme Court has held, a federal court may skip over the procedural default analysis if a claim would fail on the merits in any event." (collecting cases)). As explained below, Davis fails to establish "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

As the Florida Supreme Court recounted, Davis presented the following evidence in mitigation at the BP penalty phase:

> As mitigation, Davis presented evidence of a sexual assault when he was eight years old, severe physical abuse by a caretaker in the years following the sexual assault, ongoing depressive and mood episodes, and a suicide attempt while he was in the military. Davis submitted for the court's consideration the testimony of the three mitigation witnesses from the Headley trial: Dawn Henry, the mother of Davis's son; Linda Davis, Davis's mother; and India Owens, Davis's sister. Davis also introduced his medical records from his military service.
>
> Davis's mother described her relationship with Davis as very close. Although Davis's father moved out of the family home when Davis was about one year old, his father maintained a relationship with Davis.

> From elementary through high school, Davis suffered an ongoing pattern of bullying. When Davis was eight years old, another boy beat and sexually assaulted him. Although Davis's family members were aware of the assault, they did not talk about it.
>
> Additionally, when Davis was around eight or nine years old, a woman named Ms. Clark came to live in the family home as a roommate. Eventually, Davis and his brother moved out of the family home and into another home with Clark. Clark was an alcoholic and was physically and verbally abusive. She taunted and verbally abused Davis because he was bullied, and she also beat him with extension cords and water hoses and punched him in the chest in order to try and make him "be a man." On one occasion, Clark severely beat Davis with an extension cord. Davis ran home to his mother, who observed severe injuries to his back. Family members observed physical injuries such as welts, bleeding, and scabs and sores on Davis's body.
>
> In middle school, Davis contemplated suicide, and his mother encouraged him not to take his life. Davis received mental health counseling for two to three months. Davis later joined the military and while enlisted, he attempted suicide by hitting a concrete pole while driving at a high rate of speed. Thereafter, he was discharged from the military.
>
> After Davis was discharged from the military, he met Dawn Henry. Henry and Davis eventually had a son who was born with Down Syndrome. Henry testified that while she had trouble adjusting to being a mother of a child with special needs, Davis immediately accepted his son and was consistently and frequently present in his life. Around the time of the Headley robbery, Davis was depressed and upset that he could not afford to do anything for his son's approaching birthday. When Davis purchased the gun shortly before the robbery, his mother was concerned that he might use the gun to commit suicide.

*Davis*, 207 So. 3d at 187. Although not mentioned in this summary, Davis's military records indicated that after he attempted to commit suicide by crashing his vehicle, he was diagnosed with a "personality disorder." *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-10 at 185.

The trial court ultimately sentenced Davis to death for the two murders he committed during the BP incident, concluding that the "aggravating circumstances . . . far

outweigh[ed] the mitigating circumstances." (Doc. 23-4 at 868-69). The court found three aggravating circumstances: "(1) the capital felony was committed by a person previously convicted of a felony and on felony probation (moderate weight); (2) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); and (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing a robbery (great weight)." *Davis*, 207 So. 3d at 188. The second aggravating circumstance—prior conviction of a capital felony—concerned the murders of Bustamante and Luciano at the Headley Insurance Agency.[13] (Doc. 23-4 at 861).

The court found one statutory mitigating circumstance—"the crime was committed while Davis was under the influence of extreme mental or emotional disturbance"—and fifteen nonstatutory mitigating circumstances, including that (1) Davis was bullied and sexually assaulted as a child; (2) he was the "victim of child abuse, both physical and emotional, by a caretaker"; (3) he had a "history of being suicidal both as a child and as an adult"; (4) he was diagnosed with a "personality disorder"; and (5) he was dealing with "stressors at the time of the incident." *Davis*, 207 So. 3d at 188.

Davis now contends that, had counsel conducted an "adequate investigation," an "abundance" of additional mitigating evidence would have emerged. (Doc. 28 at 156).

[13] The Headley incident took place six days after the BP incident. *Davis*, 207 So. 3d at 183-85. However, Davis was convicted and sentenced for the Headley murders before he was tried for the BP murders. (Doc. 23-4 at 861). Under Florida law, "previous violent felony convictions suffice for purposes of the prior violent felony aggravator so long as the convictions predate the sentencing, even when the crimes underlying the conviction occurred after the crime for which the defendant is being sentenced." *Knight v. State*, 746 So. 2d 423, 434 (Fla. 1998).

Specifically, the trial court would have learned that (1) Davis's mother "severely beat" him and his siblings, "subject[ing] [him] to waterboarding in the kitchen sink"; (2) Davis's mother suffered from bipolar disorder and schizophrenia, she tried to kill herself during Davis's childhood, and she "sold cocaine out of the house"; (3) Davis's sister suffered from bipolar disorder; (4) Davis "long exhibited behaviors" consistent with bipolar disorder, including mood swings and "extreme" obsessive-compulsive behavior; (5) Davis's "self-confidence, self-efficacy, and decision-making skills were irreparably ruined by the parental abandonment he experienced and overall lack of positive role models"; (6) Davis's "Adverse Childhood Experience Questionnaire" score was eight, a figure reached by less than "2.25% of a sample of high-risk youth in the Florida Department of Juvenile Justice database"; and (7) Davis may have "suffered a traumatic brain injury during the car crash/suicide attempt." (*Id.* at 156-62).

Davis has not met his burden of establishing that he was prejudiced by counsel's failure to present additional mitigating evidence. "When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Thornell v. Jones*, 602 U.S. 154, 163 (2024) (internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "In determining whether there is a reasonable probability of a different result, a court must consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in

the habeas proceeding—and reweig[h] it against the evidence in aggravation." *Gavin v. Comm'r, Alabama Dep't of Corr.*, 40 F.4th 1247, 1263 (11th Cir. 2022) (internal quotation marks omitted).

As an initial matter, much of the additional mitigation is cumulative of the evidence presented at the penalty phase. As the Florida Supreme Court explained, the trial court heard that Davis experienced "severe physical abuse" during his childhood. *Davis*, 207 So. 3d at 187. The court learned that Davis moved out of the family home and stayed with Ms. Clark, an "alcoholic" who "was physically and verbally abusive." *Id.* She "taunted and verbally abused Davis because he was bullied, and she also beat him with extension cords and water hoses and punched him in the chest in order to try and make him 'be a man.'" *Id.* On one occasion, she "severely beat Davis with an extension cord," prompting him to "[run] home to his mother, who observed severe injuries to his back." *Id.* The penalty phase also included evidence that family members saw "physical injuries such as welts, bleeding, and scabs and sores on Davis's body," and that Davis was "sexually assaulted" by another child when he was eight years old. *Id.* Davis faults counsel for failing to present additional evidence about his mother: that she also subjected him to physical abuse, suffered from bipolar disorder, attempted to kill herself, and dealt drugs out of the family home. (Doc. 28 at 157-58). He also notes that, according to the Adverse Childhood Experience Questionnaire, he experienced a level of childhood adversity suffered by a small percentage of the population. (*Id.* at 161). Finally, he claims that a "mental health expert" could have explained that his emotional development was "ruined by the parental abandonment he experienced and overall lack of positive role models." (*Id.* at 160). This new evidence of

"childhood trauma" would have provided little benefit to Davis because it was "substantially similar to the evidence [he] presented at the" penalty phase. *Sochor v. Sec'y Dep't of Corr.*, 685 F.3d 1016, 1032 (11th Cir. 2012). As the summary above makes clear, the trial court was well aware that Davis endured a severely abusive childhood that detrimentally affected his mental health. "Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial." *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011).

Davis also fails to show that he was prejudiced by the omission of additional mental-health evidence. According to Davis, he "long exhibited behaviors and symptoms of" bipolar disorder, including mood swings, "'loops' with his behavior," "extreme" obsessive-compulsive behaviors, a "short temper," and "anxiety." (Doc. 28 at 160). But Davis presents no evidence that he has ever formally been diagnosed with bipolar disorder. Instead, he says that counsel should have sought a "mental health evaluation from an appropriate mental health professional to assess whether . . . [he] suffered from this illness." (*Id.*) This Court cannot "simply assume that if [Davis] had undergone further examination," a diagnosis of bipolar disorder "would have, in fact, been made." *Hall v. Head*, 310 F.3d 683, 704 (11th Cir. 2002). "Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation."[14] *Aldrich,* 777 F.2d at 636. Regardless, the trial court learned that Davis suffered from

[14] Equally speculative is Davis's assertion that he might have "suffered a traumatic brain injury during the car crash/suicide attempt." (Doc. 28 at 162). Davis presents no new evidence to support the existence of such an injury.

"ongoing depressive and mood episodes," that he talked about killing himself, that he once attempted to commit suicide by crashing a vehicle he was driving, and that he engaged in behavior that "we would consider . . . obsessive compulsive disorder." *Davis*, 207 So. 3d at 187; *Davis*, No. 8:24-cv-861-WFJ-CPT, Doc. 23-10 at 332. Additional mental-health evidence would have merely told "a more detailed version of the same story told at trial[,] provide[d] more or better examples[,] or amplifie[d] the themes presented to the [factfinder]." *Dallas*, 964 F.3d at 1308.

Davis's "failure to adduce significant new mitigating evidence stands in contrast to cases in which courts have concluded that petitioners met their burden under the prejudice prong." *Knight v. Fla. Dep't of Corr.*, 958 F.3d 1035, 1049 (11th Cir. 2020). For example, in *Porter v. McCollum*, "[t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." 558 U.S. 30, 41 (2009). Counsel was deficient for failing to present substantial mitigating evidence, including "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id.* Thus, *Porter* involved a "vast" "disparity between what was presented at trial and what was offered collaterally." *Dallas*, 964 F.3d at 1312. Here, by contrast, the new mitigating evidence "would barely have altered the sentencing profile presented" at Davis's trial. *Strickland*, 466 U.S. at 700.

Moreover, "the aggravating evidence presented against [Davis] was powerful." *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1357 (11th Cir. 2020). The trial court gave "very great weight" to Davis's prior convictions for murdering Bustamante and Luciano at the Headley Insurance Agency. (Doc. 23-4 at 861). Those murders were horrific. When Bustamante and Luciano "did not give Davis the money that he wanted, he threw gasoline on them and set them on fire." *Davis*, 207 So. 3d at 199. Davis then shot Bustamante "in her left hand" as she tried to escape, and he proceeded to shoot a Good Samaritan in the face. *Id.* at 185. Bustamante and Luciano suffered catastrophic burns that covered eighty to ninety percent of their bodies. *Id.* at 186. Both ultimately died of their injuries, as did Luciano's prematurely delivered child. *Id.* In Florida, "the prior violent felony aggravator is considered one of the weightiest aggravators," and it is particularly weighty where, as here, the prior felonies were two exceptionally cruel and senseless murders committed within a week of the instant offenses. *Silvia v. State*, 60 So. 3d 959, 974 (Fla. 2011); *see also Smiley v. State*, 295 So. 3d 156, 174 (Fla. 2020) ("[I]n evaluating the weight of the prior violent felony aggravator, the facts upon which the aggravator is based are critical to our analysis." (internal quotation marks omitted)). "In the face of these facts and the extensive mitigating evidence offered by defense counsel at the penalty phase, adding all of this together, the good and the bad, there is no reasonable probability that the additional mitigating evidence would have changed the outcome." *Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1254 (11th Cir. 2017).

### P. Ground Eleven, Sub-Claim A—Alleged Improper Weighing of Aggravating Factors

Davis contends that the trial court violated his right to "individualized sentencing" by misstating the weight it gave to the three aggravating factors. (Doc. 28 at 165). In the "aggravators" section of the sentencing order, the court gave "moderate weight" to Davis's felony-probation status, "very great weight" to his prior capital-felony convictions, and "great weight" to the fact that he committed the BP murders during an attempted robbery. (Doc. 23-4 at 861-62). For each aggravator, the court discussed the evidence supporting its weight assignment. (*Id.*) In the "conclusion" section of the order, however, the court stated that it "has assigned great weight" to all three aggravators. (*Id.* at 868). Davis contends that this "false[] summar[y]" of the weights assigned to the aggravators violated his rights to "due process and individualized sentencing." (Doc. 1 at 107).

The Florida Supreme Court rejected this claim. *Davis*, 207 So. 3d at 210. It acknowledged that the trial court "misstate[d] the weight that it gave to two of the aggravating factors." *Id.* But, "while the court overstated the weight assigned to one aggravating circumstance (Davis was previously convicted of a felony and on felony probation), it understated the weight assigned to another (prior capital/violent felony)." *Id.* Moreover, the Florida Supreme Court noted that the "sentencing order reflect[ed] a detailed consideration of each aggravating circumstance and acknowledge[d] 'that the process [was] not simply a quantitative analysis but a qualitative one.'" *Id.* Based on this "qualitative analysis, the trial court concluded that the aggravating circumstances

outweighed the mitigating circumstances." *Id.* As a result, the Florida Supreme Court found that Davis was "not entitled to relief." *Id.*

This ruling was reasonable. "The Constitution prohibits the arbitrary or irrational imposition of the death penalty." *Parker*, 498 U.S. at 321. Thus, the decision whether to impose a death sentence requires "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (emphasis omitted). Here, Davis received the required "individualized determination." *Id.* The trial court separately evaluated each aggravating circumstance, discussed its evidentiary basis, and expressly assigned its weight. (Doc. 23-4 at 861-63). As explained above, the court gave "moderate weight" to Davis's felony-probation status, "very great weight" to his prior capital-felony convictions, and "great weight" to his commission of the BP murders during an attempted robbery. (*Id.* at 861-62). After considering Davis's evidence in mitigation, the court concluded that the "aggravating circumstances . . . far outweigh[ed] the mitigating circumstances" and sentenced Davis to death. (*Id.* at 868-69).

To be sure, the conclusion of the sentencing order mistakenly stated that the court "has assigned great weight" to all three aggravators. (*Id.* at 868). Read in context, however, this concluding description is best understood as an inaccurate summary of the preceding findings. The reference to weights the court "has assigned" points back to the specific findings already made. Immediately afterward, the court explained that its weighing was "not simply a quantitative analysis but a qualitative one," entailing consideration of "the nature and quality of the aggravating and mitigating circumstances that have been

established." (*Id.*) Considered as a whole, the court's detailed findings and its explanation of the ultimate balance show that it applied the assessments set forth in the "aggravators" section and inadvertently misstated them in the conclusion. Davis does not cite—and this Court cannot locate—any authority suggesting that this scrivener's error violated his constitutional rights. Because he received "an individualized determination on the basis of [his] character . . . and the circumstances of the crime[s]," Davis is not entitled to relief. *Tuilaepa*, 512 U.S. at 972.

### Q. Ground Eleven, Sub-Claim B—Alleged Improper Weighing of Mitigating Factors

Davis maintains that the trial court violated his "rights to individualized sentencing and due process" by erroneously discounting two nonstatutory mitigating factors—stressors at the time of the incident and being a good person in general. (Doc. 1 at 105, 107). The court assigned both mitigators "little weight." (Doc. 23-4 at 866-67). With respect to stressors, the court wrote in the sentencing order:

> It is obvious that the Defendant was under some financial stress in December 2007. By that time, he had lost his long term, good paying job at Florida Natural Growers and had gone to work for the City of Eagle Lake. However, he also lost that job and received his last paycheck from the City of Eagle Lake on December 6, 2007.
>
> The Defendant's wife, Victoria Lynn Davis, was on a leave of absence from her job due to problems with her pregnancy. The family owed past due mortgage payments and had maxed out their credit cards. The Defendant did not have any significant amount of cash in the bank and was facing his son's upcoming birthday and the Christmas holidays.
>
> His son . . . was born with [Down] syndrome, and the Defendant was actively participating in this upbringing. It is clear that he spent a lot of time with his son. . . .

> The Court finds this mitigating circumstance has been proven by a greater weight of the evidence, *but it does not justify a decision to rob a convenience store and murder two victims in the course of the attempted robbery.*
>
> The Court assigns this mitigator little weight.

(*Id.* (emphasis added)).

With respect to being a good person in general, the court wrote:

> The evidence establishes that the Defendant, Leon Davis Jr., was a loving husband, who was devoted to his [Down] syndrome son. . . . He was also actively involved in his family, regularly seeing his brother and his sisters.
>
> It appears that he was very well regarded by his entire family, his friends, and his employers.
>
> The Court finds this mitigator has been proven by a greater weight of the evidence *but, in light of the murders at Headley Insurance Agency, assigns it little weight.*

(*Id.* at 867 (emphasis added)).

The Florida Supreme Court found that the trial court "erred when it discounted these nonstatutory mitigating circumstances based on other factors." *Davis*, 207 So. 3d at 209. Citing Florida law, the court explained that "each mitigating circumstance is to be analyzed and weighed individually." *Id.* (quoting *Perez v. State*, 919 So. 2d 347, 373-74 (Fla. 2005)). According to the Florida Supreme Court, the trial court violated this rule when it "found as a nonstatutory mitigating circumstance that Davis was subject to stressors at the time of the BP murders but discounted the mitigation because it did not justify the BP attempted robbery and murders." *Id.* Likewise, the trial court erred when it "found as a nonstatutory mitigating circumstance that Davis was a good person in general," but "assigned the mitigation little weight 'in light of the murders at Headley Insurance Agency.'" *Id.*

Nevertheless, the Florida Supreme Court concluded that the "error [was] harmless" in light of "the weighty aggravating circumstances in this case." *Id.*

Even under *de novo* review, Davis is not entitled to relief because he cannot show that the trial court's error violated his rights under the federal constitution. Davis relies on *Lockett v. Ohio*, 438 U.S. 586 (1978) and its progeny, (Doc. 1 at 105), but those cases "stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence." *Johnson v. Texas*, 509 U.S. 350, 361 (1993). In other words, a sentencer must not be prohibited from considering as mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett*, 438 U.S. at 604). But the constitution "does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." *Schwab v. Crosby,* 451 F.3d 1308, 1329 (11th Cir. 2006). "All that is forbidden is for sentencing courts to give mitigating evidence 'no weight *by excluding such evidence from their consideration*.'" *Clark v. Att'y Gen., Fla.*, 821 F.3d 1270, 1286 (11th Cir. 2016) (quoting *Eddings*, 455 U.S. at 115).

Here, the trial court did not "refuse to consider evidence offered in mitigation." *Schwab*, 451 F.3d at 1329. To the contrary, it described Davis's financial and family stressors, found the stressors mitigator "proven by a greater weight of the evidence," and assigned it "little weight" because the stressors did not justify the murders and attempted robbery. (Doc. 23-4 at 867). Similarly, the court described Davis's favorable family

relationships and reputation, found the good-person mitigator "proven by a greater weight of the evidence," and assigned it "little weight" in light of the Headley murders. (*Id.*) "When a trial court considers mitigating evidence during sentencing, as the trial court did here with respect to [the stressors and good-person mitigators], there simply is no constitutional error of the kind [Davis] now urges [the Court] to recognize." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1131-32 (11th Cir. 2012).

It is true that the court misapplied Florida law when it reduced the weight it gave to these mitigators based on "other factors." *Davis*, 207 So. 3d at 209. But "a violation of state law is not sufficient to entitle a petitioner to federal habeas relief." *Clark*, 821 F.3d at 1287. And the Supreme Court has made clear that, under the federal constitution, "the sentencer need not accept or ascribe any specific weight to the evidence that it considers" in mitigation. *Morris*, 677 F.3d at 1131. Again, the constitution requires only that "the sentencer be allowed to consider and give effect to evidence offered in mitigation." *Schwab*, 451 F.3d at 1329. This principle was not violated during Davis's penalty-phase proceedings. Because Davis identifies no federal constitutional violation in the court's weighing of the stressor and good-person mitigators, he is not entitled to federal habeas relief.[15] *See Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Acceptance of

[15] Even if Davis had shown a constitutional violation, his claim would still fail because, as the Florida Supreme Court explained, any "error [was] harmless" in light of "the weighty aggravating circumstances in this case." *Davis*, 207 So. 3d at 209. Given the strength of the aggravating circumstances, Davis cannot show "more than a reasonable possibility" that he would have received a life sentence had the trial court properly evaluated the stressor and good-person mitigators. *Troy v. Sec'y, Fla. Dep't of Corr.*, 763 F.3d 1305, 1316 (11th Cir. 2014).

nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer consider the factors.").

**R. Ground Twelve—Cumulative Error**

Davis contends that he is "entitled to relief" due to the "cumulative effect" of the alleged errors discussed above. (Doc. 1 at 107). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris*, 677 F.3d at 1132. As explained above, Davis's individual claims uniformly lack merit. Therefore, he cannot show cumulative prejudicial effect.

**S. Ground Thirteen—Ineffective Assistance of Appellate Counsel**

In his petition, Davis argues that appellate counsel provided ineffective assistance by failing to adequately preserve the federal nature of one of his claims on direct appeal. (Doc. 1 at 108-09). In his reply, however, Davis "withdraws" this ineffective-assistance claim. (Doc. 28 at 170). Therefore, Ground Thirteen is dismissed. *See Fulton v. Sec'y, Dep't of Corr.*, No. 6:17-cv-234-GKS-TBS, 2019 WL 10303104, at *1 n.1 (M.D. Fla. Jan. 17, 2019) ("In his Reply, Petitioner voluntarily dismisses grounds one, three, four, six, and seven. These grounds, therefore, are dismissed, and the Court will not address them.").

## IV. Conclusion

Accordingly, the Court **ORDERS**:

1. Davis's petition for writ of habeas corpus, (Doc. 1), is **DENIED**.

2. The **CLERK** is directed to enter judgment against Davis and to **CLOSE** this case.

3. Davis is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Davis must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Davis has not made the requisite showing. Because Davis is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on October 26, 2026.



**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**